[Crim. No. 34863. Second Dist., Div. Two. Jan. 30, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
LORI ELLEN ANDERSEN, Defendant and Appellant.

**COUNSEL**

Jacobs, Jacobs & Witmer and R. M. Jacobs for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FLEMING, J.—**

I

On 27 January 1978 the body of Susan Joan Hyde was discovered buried in an isolated location above Foothill Boulevard, Los Angeles. Portions of the body were badly charred, some of its fingers were miss-

ing, the knee joints were missing, and the legs were separated from the torso. The torso was wrapped in a blue bedspread; the legs were separately wrapped in a towel. Ms. Hyde had been shot four times with .22 caliber bullets, once in the liver, once in the chest, and twice in the arm. The shots were the cause of her death.

Susan Hyde (Susan),[1] age 31, had last been seen alive about 5:15 p.m. on January 13 at the tennis courts of California State University, Northridge, where she was a faculty instructor, tennis teacher, and coach of the women's tennis team. She lived with Janis Hasse in Burbank in a house the two had purchased in joint tenancy three years earlier.

Janis Hasse (Jan), age 29, was a professional tennis player, tennis shop operator, and tennis teacher, who became friendly with Susan through tennis. Friendship led to love, and for the past four and one-half to five years the two had lived together in a homosexual relationship.

Lori Andersen (Lori), age 21, was a student at California State University, Northridge, and the number one player on the tennis team which Susan coached. Lori had transferred to Northridge from Redlands University on the recruiting and at the urging of Susan, who as tennis coach had some control over the university's tennis scholarships. Like Susan and Jan, she was homosexually active. At Northridge, according to Lori, tennis and homosexuality went hand in hand. After her transfer Lori became friendly with Jan. The two practiced together, played doubles as partners, traveled together on out-of-town tennis tournaments, exchanged gifts and notes, and during the first half of 1977 carried on an intense, homosexual, love affair. Nonetheless, Jan continued to reside and have homosexual relations with Susan, and her lovemaking with Lori usually took place when Susan was out-of-town or when Jan and Lori were playing at tennis tournaments which Susan did not attend.

In August 1977 Jan delivered a note to Lori terminating their love affair and stating the two could only be friends. Yet by reason of their tennis activities and connections the two continued to see one another frequently.

---

[1]We follow the practice of the trial court, trial counsel, and witnesses, in identifying the three principals by first names.

In the first week of January 1978 Susan left town to visit her mother in Houston. On the afternoon of January 6 Jan and Lori played tennis together, and after tennis Lori brought a jigsaw puzzle to Jan's Burbank house for the two to put together. They worked on the puzzle at a card table in front of the fireplace that evening and part of the next morning and assembled two-thirds of it. About noon Jan left in her automobile to start a two-month tennis tour, which would take her to Tucson, Columbus, Ottawa, and elsewhere. She gave Lori a key to the house and asked her to feed her animals until Susan returned from Houston the following day. Susan returned to Burbank on schedule and retrieved the house key from Lori. On January 8 and again on January 10 Jan talked to Susan by telephone from Tucson.

On Friday, January 13, Susan played doubles at Northridge with Lori and two others, the game finishing about 5:15 p.m. Thereafter, she disappeared from view until her body was found two weeks later on January 27. The known events of this two-week period follow in chronological form:

*Sunday, January 15.* Jan telephoned home from Columbus to talk to Susan about her tennis, and to her surprise Lori answered the phone. Susan had gone away for the weekend, said Lori, where she did not know, and had asked her to feed the animals while Susan was gone.

*Monday, January 16.* Lori told her fellow tennis team members at Northridge that Susan had asked her to take over team practice that day because Susan might not return in time from the weekend.

From Columbus, Jan telephoned home several times. No one answered.

*Tuesday, January 17.* One of Jan's repeated telephone calls home was finally answered by Lori, who reported Susan had still not returned from the weekend. Jan telephoned two of Susan's friends in Los Angeles, who had no information about her whereabouts.

*Wednesday, January 18.* Jan's telephone call from Columbus was again answered by Lori. During this conversation Lori said Susan had asked her on Friday, January 13, to supervise tennis practice the following Monday if Susan did not return in time. Jan asked Lori when Susan had given her a house key, and Lori said she couldn't remember. Jan

asked to be notified whether Susan showed up for an important student-teacher meeting scheduled for the next day.

Susan's two friends reported her missing to the Los Angeles Police Department.

*Thursday, January 19.* Lori telephoned Jan in Columbus to report that Susan had not kept her appointment for the student-teacher meeting. Jan said she would fly to Tucson, pick up her automobile, and drive to Los Angeles.

*Friday, January 20.* When Jan arrived at Tucson she found Lori, uninvited, at the Tucson airport. The two drove to Los Angeles, where they first went to Susan's office and then returned to the Burbank house. The jigsaw puzzle was still on the table in front of the fireplace, two-thirds completed. In a joint search of the house they found missing an assortment of Susan's clothing, her curling iron, her toothbrush, and a blue bedspread. Jan saw a gouge in the plaster in the bathroom but attached no significance to it at the time. Lori pointed to a place in the backyard where the soil had been disturbed and said the dog had dug a hole. A plastic drop cloth in the garage was missing.

*Sunday, January 22.* Lori and Jan played tennis for two hours. Lori told Jan she had taken the uncompleted jigsaw puzzle home and then brought it back to the Burbank house on Monday, a statement which puzzled Jan.

That day Lori visited Susan's next-door neighbors to inquire whether they knew of Susan's whereabouts.

*Monday, January 23.* Lori and Jan played tennis for two hours. After tennis Jan asked for the return of the key to her house and told Lori she didn't like the rumors the latter had been spreading about the resumption of their love affair. When Lori attempted to explain, Jan said she wasn't interested in explanations.

*Tuesday, January 24.* Lori left a note on the windshield of Jan's automobile apologizing for having falsely told others she had received a stereo set as a gift from Jan.

That afternoon Mrs. Hyde, Susan's mother, arrived from Houston. She and Jan reported Susan's disappearance to the Burbank Police Department.

*Wednesday, January 25.* Officer DeAmicis of the Burbank Police Department, assigned to investigate the disappearance of Susan, went to the Burbank house, where Jan pointed out the plaster gouge in the bathroom and what appeared to be a bullet hole in a wooden shutter door in the hallway. On investigation Officer DeAmicis found a .22 caliber bullet in a shag rug near the shutter door. He also talked to a neighbor, who had heard four rapid shots fired about 11:30 p.m. on Friday, January 13. Subsequently, the police obtained from a San Fernando pawnbroker a .22 caliber revolver which Lori had purchased in September and sold back to the pawnbroker on January 16. The revolver and the bullet were sent to the police criminalistics laboratory for examination. Officer DeAmicis then went to Granada Hills to talk to Lori but was unable to find her.

*Thursday, January 26, and Friday, January 27.* Officer DeAmicis was still unable to locate Lori, but one of her friends reported, and he confirmed, that she had spent the previous night at a San Fernando motel. That evening he heard that Lori had been found lying in a Burbank street with her hands tied in front of her and had been taken to Burbank Community Hospital. Accompanied by Officer Rickards, he went to the hospital to interview her.

Lori told the police that the previous afternoon she had been kidnaped from her front doorstep in Granada Hills by a pockmarked Mexican, who had driven her around in a van for about a day and a half and then pushed her out of the van into the street. After recounting her kidnaping in some detail Lori said she had something further to tell the police which she should have told them a long time ago. At that point she was formally and fully advised of her constitutional rights to silence and to advice of counsel, and she agreed to waive those rights. She then recounted to the officers that the person who kidnaped her had also kidnaped Susan from her house in Burbank at a time Lori had been present. During this earlier kidnaping, said Lori, she was told by the kidnaper to make up a convincing story to account for Susan's absence so that Susan would be released alive. The kidnaper also told her to get rid of the gun she kept in her glove compartment. To comply with these orders she made up the story of Susan's weekend trip and sold back her gun to the pawnbroker from whom she had bought it.

About 11:15 p.m. Lori accompanied the police to the Burbank police station, where, after again being advised of her rights, she repeated her story on tape about the pockmarked Mexican kidnaper, adding the corroborative detail that he wore a leather jacket, Levis, and tennis shoes, and from time to time had kicked her. Her story that Susan was on vacation should be convincing, the kidnaper told her, because Susan's life depended on it. She thought Susan might still be alive somewhere in the hills between Burbank and Granada Hills, and when the police asked if she could help them find Susan's whereabouts, she volunteered that if she were to drive around the area she might recognize the roads.

Thereupon the police and Lori drove on dirt roads in the Burbank-Glendale area in an attempt to find the place where she had been held captive. On the drive she said that during her kidnaping she had heard the sound of digging. After an hour-and-a-half drive the search party returned to the Burbank police station.

In a tape-recorded interview with Officers DeAmicis and Rickards starting at 2 a.m. Lori was advised of her constitutional rights for the third time that night, and for the third time she waived them. Early in this interview Lori said Susan never asked her to take care of the animals over the weekend nor had Susan given her the house key. She had gotten the key by taking it off Susan's key ring. The officers then told Lori they had information that her gun had been fired in the house, that a neighbor had heard multiple gunshots at 11:30 at night.

"So you think I used the gun...?" asked Lori. We don't know who used the gun, replied the officers. We found two bullet holes and one bullet in the house, a blue bedspread is missing, and we have your receipt for the gun that you sold.

"You're saying that I used my gun on Susan?" Lori asked. We don't know, replied the officers, but this is what we think happened:

"...We know that Susan and Jan are lovers, that's right out in the front by Jan."

"Um-hum."

"We know that there [have] been rumors that Jan wanted to stop, that you were trying to move in with her, that you're in love with her,

and that you were not happy with Susan as a coach at school and as a person living with Jan. We believe that you went to that house between the hours of ten, sometime between the hours of ten o'clock and eleven thirty...with that .22 caliber gun...you probably got into an argument relating to your love affair with Jan, that during the argument you took the gun and then fired the gun five times, possibly six times at her....We then think that Susan died instantly, that you took the bedspread and put her body into the bedspread and took the body to the van....You took the body with the van up into the Verdugo Hills, and you disposed of the body in the Verdugo Hills." Officer DeAmicis then told Lori the police knew she had spent the previous night at the Mission Hills Inn and that she had not been kidnaped. The lie-time is over, said Officer DeAmicis. Think of Susan's mother beside herself with grief not knowing what has happened. The best and easiest thing at this point is to tell us where Susan's body is. Get the burden off your conscience by telling us the truth.

"And spend the rest of my life in jail?" asked Lori. Officer DeAmicis replied that if the killing happened the way they thought it happened, the outcome could be a lot different. Officer Rickards said he was not a lawyer and couldn't make any promises, but he could explain that murder is broken into degrees, including involuntary manslaughter. If a shooting takes place in the heat of an argument, as happens in thousands of love triangles, and if we prove the shooting happened as we think it happened, said the officers, admission and explanation of one's intent is a lot different with judge or jury than is denial contrary to all the evidence. They knew she was remorseful, they said, because she feigned the kidnaping to bring the whole thing to light.

Lori then told them that on Friday night when she had gone to pick up the jigsaw puzzle she and Susan had gotten into an argument, just as the officers had said. She put the puzzle in her automobile, drove around the block, returned, took out her gun, went back to the house, and shot Susan as the latter was opening the front door. She then went back to her automobile, had second thoughts, returned to the house, found Susan behind the door of the den with her body holding the door shut, put her hand around the door and shot Susan a couple of more times. She wrapped Susan's body in the bedspread, took it into the backyard, and set her clothes on fire with charcoal lighter fluid. The next morning she put the body in Susan's van, drove to an isolated spot in the hills, and buried the body. She then returned the van to Susan's house and left it there.

After the interview Lori led the police to an isolated dirt area in Sylmar above Foothill Boulevard and showed them the spot where she had buried Susan's body in a grave 12 to 18 inches deep. Buried separately about 50 feet away were Susan's toilet articles and purse, the latter containing keys, wallet, checkbook, and cards.

*The trial.* In the subsequent murder trial it was established that the four bullets found in Susan's body had been fired from the revolver Lori had purchased; that she bought the revolver in late August or early September shortly after she received Jan's note terminating their love affair; that she kept the revolver in her bureau drawer; that she practiced firing it; that when she sold the gun back to the pawnbroker she told him she had no further use for it.

In her own defense, Lori testified she had bought the revolver intending to commit suicide, that most of the time she kept it in her automobile glove compartment. On Friday, January 13, she went to Susan's house to pick up the puzzle. After she put the puzzle in her automobile, she returned to the house. At that time Susan criticized her tennis training, said Jan wasn't interested in her any more, and said she should find herself another friend. Lori went out to get the loaded gun from the glove compartment of her automobile, returned to the house, and, while she was thinking in terms of getting an apology, the gun went off. Later, she fired more shots in the living room .and the den. She was not fully oriented at the time of the shooting, and could not remember exact details of the shooting, burning, and burial. She wanted the body to disappear so Jan wouldn't come home and find it. She put the missing assortment of Susan's clothes in a Goodwill bin. Volumes of psychiatric and psychological opinion were presented on both sides.

The jury's verdict was second degree murder. The court sentenced Lori to five years imprisonment, the then minimum term for second degree murder, plus an additional two years for use of a firearm in the commission of a felony. (Pen. Code, §§ 187, 190, 12022.5.)

## II

On appeal, defendant argues that her confession was inadmissible because it was coerced by threats and promises, that all other evidence obtained as a result of this coerced confession was likewise inadmissible, and therefore the information charging her with murder should have

been set aside for lack of probable cause. Because the principal, indeed the only, issue on appeal concerns the propriety of defendant's confession, we attach the entire interview in which it was given as an appendix to this opinion.

Defendant relies on the following propositions: (1) a confession coerced by threats or promises is involuntary and hence inadmissible; (2) her confession was the product of illegal threats and promises which overcame her volition by coercion; (3) therefore, defendant's confession must be suppressed; (4) additionally, the products of that confession—which include the discovery of Susan's body, determination of the cause of death, identification of the bullets found in her body, even proof of death itself, together with defendant's entire testimony in court—must also be suppressed as products of an unlawful confession (fruit of the poisonous tree); (5) consequently, the indictment must be set aside and the conviction reversed for insufficiency of evidence. (*People* v. *Sanchez* (1969) 70 Cal.2d 562 [75 Cal.Rptr. 642, 451 P.2d 74]; *People* v. *Buchanan* (1966) 63 Cal.2d 880 [48 Cal.Rptr. 733, 409 P.2d 957]; *Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407].) The clear implication of defendant's argument is that defendant can never be prosecuted for murder, in that there is no untainted evidence to prove the victim's death, the cause of death, or defendant's connection with the death.

Defendant's argument relies on an evidentiary rule which has evolved from our aversion to the use of torture, whose modern manifestation is known as the third degree, a term which includes both beatings and physical abuse and the brainwashing that comes from repeated suggestion and prolonged interrogation. ■ Confessions obtained by coercive practices which overcome the will of the person confessing are tainted, and both the confession and its products will be suppressed.

Two reasons of policy support the rule requiring the suppression of coerced confessions. The first is the unreliability of a coerced confession, which may express the words and thoughts of the interrogator rather than those of the person confessing. It is a truism of the modern world that when sufficient pressures are applied most persons will confess, even to events that are untrue. The second reason for suppression of a coerced confession, even one demonstrably true, is to eliminate brutality in the conduct of interrogation, to require police interrogators to conform to the standard of due process and the Fifth Amendment by

making the products of coercive interrogation unusable. (*Rogers* v. *Richmond* (1961) 365 U.S. 534, 541 [5 L.Ed.2d 760, 766-767, 81 S.Ct. 735].) As put by Traynor, J., concurring in *People* v. *Garner* (1961) 57 Cal.2d 135, 156, 163 [18 Cal.Rptr. 40, 367 P.2d 680], "In the case of coerced confessions, the evidence may be unreliable; even if reliable, a free society cannot condone police methods that outrage the rights and dignity of a person whether they include physical brutality or psychological coercion."

■ An offshoot of the rule against coerced confessions prohibits the use of confessions obtained by false promises, which are looked upon as a type of coercion which overcomes by unacceptable means the will of the person being questioned. It proscribes false promises of immunity or of leniency offered as a material benefit in return for a confession. It should be noted that true promises of leniency are not proscribed when made by persons authorized to make them, as for example promises of immunity or pardon extended to witnesses in return for testimonial confessions, and promises of reduced charges or reduced sentences tendered to defendants and potential defendants by plea bargains in return for judicial admissions of guilt. The reason for the rule proscribing confessions obtained by false promises is not so much the likelihood of false confession as it is the unworthiness of the method used, which is deemed to impinge upon the constitutional guaranty of due process (cf. *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]) and the constitutional prohibition against self-incrimination (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 453 [16 L.Ed.2d 694, 711-712, 86 S.Ct. 1602, 10 A.L.R.3d 974]).

In sum, coercive questioning which overcomes the volition of the suspect by means of threats or false promises is proscribed.

The practical application of the rule against coercive questioning presents great difficulty whenever a police investigator talks to a reluctant witness who is also a suspect. When a person under questioning would prefer not to answer, almost all interrogation involves some degree of pressure—as in the instance of the bystander to a gang murder or the spouse who returns home at 2 a.m. after an unexplained absence. Both would prefer not to answer, yet the pressure of the question requires them to weigh the factors involved and decide whether to answer or not. The pressure posed by the question is self-evident, but if the person questioned does not feel compelled to answer, the pressure is not considered excessive and hence not coercive. For many years courts wrestled

with the problem of determining the point at which the pressure of questioning becomes coercive. Ultimately, the United States Supreme Court concluded that the matter could best be handled by formula. In *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], the court adopted a rule requiring a suspect under interrogation in custody to be advised he need not answer questions; if he does, his answers can be used against him; he is entitled to consult a lawyer; if he cannot afford a lawyer one will be provided at no expense. The court has interpreted custody broadly, to include any situation where a suspect is under interrogation in police surroundings and does not feel free to leave. But the *Miranda* court rejected a rule that would prohibit all questioning of suspects. "Confessions remain a proper element in law enforcement." (*Miranda v. Arizona* (1966) *supra*, at p. 478 [16 L.Ed.2d at p. 726].) ■ Once a suspect has been properly advised of his rights, he may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect. As noted by Friedman, J., good faith confrontation is an interrogation technique possessing no apparent constitutional vice. (*People v. Lantz* (1968) 265 Cal.App.2d 5, 8 [71 Cal.Rptr. 188].) Yet in carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession. It is apparent that when the police interview a suspect, they must skate a fine line. They are employed to protect the public, to solve crimes, to discover missing persons, and to determine whether missing persons have been the victims of foul play. They are authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise.

With this background on the rights and duties of police officers in the conduct of criminal investigations, we turn to the facts of this case. The investigation started on January 24 when Mrs. Hyde and Jan reported to the Burbank Police Department the disappearance of Susan Hyde, last seen on January 13. The police discovered two bullet marks and a spent .22 caliber bullet in Susan's house and learned that gunshots had been heard on the night of January 13. They also learned that defendant had owned a .22 caliber revolver which she sold to a pawnbroker on January 16, that the bullet in Susan's house had been fired from

that revolver, that defendant had a key to the house, and that she had reported to Jan and others that Susan had gone away for the weekend. On the night of January 26 the police located defendant in a Burbank hospital, a reported victim of kidnaping. Her story was that she had been kidnaped by a pockmarked Mexican who had also kidnaped Susan two weeks earlier and ordered her to make up a convincing story to account for Susan's disappearance. She thought Susan might be in the hills, alive, and she drove around the area with the police in an attempt to locate Susan and the kidnaper's lair.

On the search party's return to Burbank police headquarters the critical interview took place. At this point investigation into the disappearance of Susan Hyde was threatening to come to a deadend, except to the extent that a further interview with defendant might shed light on Susan's fate. Yet there was no longer room to doubt that defendant was a suspect. The situation was that described by Justice Traynor, concurring in *People* v. *Garner* (1961) 57 Cal.2d 135, 161-62 [18 Cal.Rptr. 40, 367 P.2d 680]: "Although questioning may sometimes be an easy substitute for scientific police work, it is also often essential to the solution of a crime and the conviction of the guilty. There may be no witnesses other than the accused, or the witnesses may be dead or unavailable. Thus, as Justice Frankfurter states in *Culombe* v. *Connecticut*, 367 U.S. 568 [81 S.Ct. 1860, 6 L.Ed.2d 1037]: 'Despite modern advances in the technology of crime detection, offenses frequently occur about which things cannot be made to speak. And where there cannot be found innocent human witnesses to such offenses, nothing remains—if police investigation is not to be balked before it has fairly begun—but to seek out possibly guilty witnesses and ask them questions, witnesses, that is, who are suspected of knowing something about the offense precisely because they are suspected of implication in it.'" Thus in questioning the suspect the police investigators were properly and correctly carrying out their duties in attempting to solve the disappearance of Susan Hyde.

In the conduct of the interview the following factors are relevant: First, the suspect received full advice of her constitutional rights, and she agreed to answer questions. (On three different occasions that night, the police gave full *Miranda* warnings, and each time defendant agreed to answer questions.) Second, there is no evidence that defendant was overcome by exhaustion or worn down by physical pressures or physical deprivations which would exert a coercive effect on her will

to resist. Third, the interview was tape recorded. We have listened carefully to the recording, and we conclude that no physical coercion or anything resembling physical pressure was used in the questioning of the suspect. The courtesy and politeness of the police officers was Chesterfieldian. Their manner of presentation of evidence compared favorably with the presentation of evidence by well-behaved lawyers in court. Neither in tone nor tempo nor decibel does coercive pressure appear. The conduct of the interview was as far removed from the third degree as it is possible to imagine.

In this state of affairs the sole issue is the content of the interview, whether the remarks of the police investigators during the interview amounted to coercive threats or false promises of a nature sufficient to categorize the defendant's confession as compelled. Both the defense and the prosecution have extracted sentences and phrases from the interview and presented them in disembodied form separated from the remainder of the interview as evidence of the presence or absence of coercion. We do not think the interview can be properly analyzed in such piecemeal fashion. Rather it must be considered as a whole in the context of the development of the dialogue between interviewers and interviewee and in the light of the totality of circumstances surrounding the confession. (*People* v. *Sanchez* (1969) 70 Cal.2d 562, 572 [75 Cal.Rptr. 642, 451 P.2d 74], and cases there cited.)

Three of these specific isolated claims may be briefly disposed of: First, there was nothing wrong in the statements made by the police officers to the interviewee urging her to tell the truth. The moral worthiness of truth-telling provides the foundation for our entire legal system of proof, as seen by the oath all witnesses take before testifying. Above and beyond the strictures of the law, truth-telling forms the keystone of our philosophical, ethical, and religious order. A witness or suspect is not required to testify, and he has a right to remain silent if to speak might incriminate him (U.S. Const., 5th Amend.). But if he does choose to testify, even if he is a criminal defendant facing the death penalty, he is legally and morally bound to tell the truth. Because defendant had been recounting demonstrable falsehoods to the police in her earlier interviews, the admonition to tell the truth was appropriate and timely and not one extraneously dragged in as a club with which to bully the suspect. It is settled that admonitions to tell the truth do not amount to coercion. (*People* v. *Hill* (1967) 66 Cal.2d 536, 548-549 [58 Cal.Rptr. 340, 426 P.2d 908], and cases there cited.) As the court said

in *People* v. *Ditson* (1962) 57 Cal.2d 415, 433 [20 Cal.Rptr. 165, 369 P.2d 714], "We do find searching questions and exhortations to help himself by revealing the acts of others. But absent something other than mere questions, or exhortations to tell the truth or clear his conscience or help himself by revealing facts as to the dominant part of Ditson or some other person in the criminal enterprise, there appears to be nothing on the face of the record which would support a finding of overreaching or coercion." We reject defendant's contention that urgings by the police to tell the truth or assertions that one is better off telling the truth amount to threats of coercion or to false promises of leniency.

Second, defendant points to the statements of police officers to the effect that a showing of remorse is a factor which mitigates punishment. This statement is no more than a truthful legal commonplace with which all persons familiar with criminal law would agree.

Third, the prosecution argues that because one of the police officers said he had no authority to make promises, the issue of benefits promised in return for a confession is not an issue in the cause. The viewpoint is too narrow, for promises can be implicit as well as explicit, and an assertion that no promises are being made may be contradicted by subsequent conversation. (*People* v. *Hill* (1967) 66 Cal.2d 536, 549-50 [58 Cal.Rptr. 340, 426 P.2d 908].)

Instead of isolated sentences and phrases, we must analyze the interview as a whole in its attendant circumstances to determine whether the confession was coerced by threats or false promises, or whether it was a product of the defendant's own volition in the light of her then feelings and circumstances. To reset the scene briefly, defendant put herself in a position which made an interview with the police inevitable by fabricating a story that she had been kidnaped. When interviewed about her own kidnaping, she told the investigating officers she had another kidnaping to report, that of Susan Hyde two weeks earlier. At that time she was given her first admonishment of rights. She then accompanied the investigating officers to the Burbank Police Department, where, having been again advised of her rights, she repeated her kidnaping story on tape. She said she thought Susan might be alive somewhere in the hills and that if she were to drive around the area she might recognize the roads. During the drive with Officers DeAmicis and Rickards she told them that during her own kidnaping she had

heard the sound of digging. When the search party returned to the police station she agreed to a further interview and was advised of her rights for a third time.

Early in this interview she said she had not been given the house key by Susan but had taken it off Susan's key ring. At that point Officer DeAmicis began to confront her with the evidence he had about the shooting at Susan's house on Friday night, January 13. The defendant then asked three critical questions:

"So you think I used the gun, is that what you're saying?" We don't know, replied the police, we just know it was used. We found bullet holes and a bullet, and we have your signature on the receipt for the sale of the gun two days after the shots were fired. We also knew a bedspread is missing.

"You're saying that I used my gun on Susan?" asked defendant. "We don't know," Officer DeAmicis answered, "but this is what we think happened." The police then outlined their theory of events and marshalled their evidence to support it, viz., defendant had shot and killed Susan in an argument over Jan; she had used the bedspread to dispose of Susan's body in the hills; her kidnaping story was false. The lie-time is over, they said, in urging her to unburden her conscience by telling the truth.

"And spend the rest of my life in jail?" defendant asked. In reply, the officers said that while they were not lawyers and could make no promises, they could explain a little law. Homicide is broken into degrees, ranging from plot-and-scheme to heat-of-passion. If the shooting took place in the heat of an argument and if they proved it happened the way they thought it had, she would be better off explaining her intent to a judge or jury than persisting in a denial contrary to all the evidence, a denial which makes things go hard. A show of remorse makes things easier, they said, and they knew she was remorseful because she feigned the kidnaping to bring the whole thing to light.

Defendant then told them what had happened at Susan's house on Friday night. She had gotten into an argument with Susan, just like the police had said, which led to the shooting, the incineration, and the burial.

In evaluating the content of this interview, we note that neither specific threats of harm nor specific promises of benefits were made. The

sole question is whether the interview, considered as a whole, amounted to an implicit threat of injuries if she did not confess, or an implicit promise of benefits if she did confess, thus making her confession a compelled one and inadmissible as evidence. The critical element in coerced confession is compulsion, an overcoming of the will of the suspect which forces or tricks her into saying something she would not otherwise be willing to say. Was this element present here?

Three factors are relevant to this issue. One is the extraordinary circumstance that the suspect sought out the police to talk to them, rather than vice versa, as is usually the case. Defendant herself so testified.

"Q. Isn't it a fact, Miss Andersen, you really wanted to talk to the police because you wanted to lay before them your abduction story, you wanted to put that in front of them. A. Yes.

"Q. You wanted to talk to them beyond any possible doubt, you wanted their ears, isn't that a fact? A. I just wanted—the kidnap story was designed to explain what happened.

"Q. Right. A. And so in that respect I wanted to talk to them."

Another unusual circumstance is that defendant testified she had not been compelled to make a statement:

"Q. . . . Some place along the interview did you believe that your abduction story wasn't being believed? A. Yes.

"Q. And that's when you were forced or felt that you had to make a more complete statement, is that correct? A. I didn't feel I had to make any statement?"

Still another unusual circumstance is that during her three interviews with the police on the night of January 26-27, defendant kept dropping broad hints she was the cause of Susan's disappearance. First, she identified herself as the last person to see Susan before her disappearance. Second, she said she had remained overnight at Susan's house. Third, she thought Susan was alive somewhere in the hills, and she offered to drive around the area to find her. Fourth, she said that during her own kidnaping she heard the sound of digging. Fifth, she said Susan hadn't given her a house key but that she had taken it off Susan's key ring. In

short, defendant herself sought out the police, brought up the subject of Susan's disappearance, and began leaking significant details of the murder—all before the police confronted her with evidence linking her to Susan's disappearance and the suspected homicide. Unquestionably, defendant was a willing witness who wanted to talk. But was she also one willing to confess?

This ultimate question can only be answered by an objective external evaluation of the interview. It is apparent that defendant was a willing witness who entered into a dialogue with the police. She sought factual answers to the factual questions she put to the police. The police answered these questions fairly and honestly and to the best of their ability by marshalling the evidence they had secured, by pointing out the falsity of her kidnaping story, and by urging her to unburden her conscience and tell the truth. Defendant then posed a legal question—would she spend the rest of her life in jail? Undoubtedly, it would have been better police practice to parry this question or merely answer it with the statement that sentence and punishment are matters for the courts. But, after initial disclaimers of legal knowledge and of authority to make promises, the police answered her question by discussing degrees of homicide, shooting in the heat of argument, and the preference of judges and juries for admissions and explanations of intent over denials against the evidence. Here, the police were venturing on thin ice because of the implication that a judge or jury would look on defendant's case in a favorable light if she showed remorse by telling the truth, and in an unfavorable light if she persisted in a false story. This implication, however, was expressly coupled with the police theory that the shooting happened the way they thought it happened. Although isolated sentences and phrases in the interview can be viewed as implied threat or implied promise, we do not believe the interrogation as a whole, put in its context, carries sufficient implication of threat or promise to make it a compelled confession contrary to the Fifth Amendment. The defendant sought out the police, she gave them a false story, she dropped hints of her own involvement in Susan's disappearance, she received *Miranda* warnings three times, she volunteered to find Susan in the hills, and she herself raised the critical question of possible punishment. In asking the police to speculate on legal matters, she, of course, knew they were not disinterested legal advisers acting on her behalf, but public investigators employed to find the missing Susan, alive or dead, and to collect evidence of any crime connected with her disappearance. The police answers to defendant's question were sub-

stantially accurate, insofar as answers to a legal question can ever be accurate. Homicide does possess degrees of culpability, and when evidence of guilt is strong, confession and avoidance is a better defense tactic than denial. The police said nothing about what they might do, only what they thought a court might do.

We have independently reviewed the facts to determine whether the confession was voluntary. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672].) We conclude, as did the committing magistrate and the trial judge, that what took place during this interview was not coercive interrogation, but a dialogue or debate between suspect and police in which the police commented on the realities of her position and the courses of conduct open to her. The benefits pointed out by the police were those which would flow naturally from a truthful and honest course of action. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 611-12 [147 Cal.Rptr. 172, 580 P.2d 672]; *People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].) If, as defendant now asserts, she gained the impression from this interview that by confessing to a grisly homicide and an elaborate attempt at concealment she would avoid being charged with murder and avoid going to jail, it was an unrealistic impression unwarranted by anything said by the police.

Beyond the specifics of the dialogue between defendant and police investigators, lies the strong implication that defendant wanted the facts to come out and wanted to be nudged into a confession. At the time of the shooting defendant felt that if Susan's body disappeared she would have Jan all to herself. She flew to Tucson to be with Jan. But her expectations collapsed 10 days after the shooting when Jan demanded the house key and expressed disapproval of the rumors circulating among their friends that their love affair had resumed. With the collapse of any benefit from the killing, defendant exhibited every classic symptom of the criminal who wants his wrongdoing found out. It is a reasonable inference that not only did defendant want to talk to the police but she wanted them to coax a confession out of her, to act as midwives at the birth of her disclosures.[2] The compulsion to confess wrong has deep psychological roots, and while confession may bring legal disabilities it also

---

[2]Following the trial, defendant told her probation officer that when she fully realized what she had done, "I wanted to tell someone but I didn't have anyone to tell so I decided to make up a story about being kidnapped."

brings great psychological relief.[3] When the legal proprieties are observed, society, the victims of crime, and the relatives of the victims of crime such as Mrs. Hyde, are entitled to the safeguards that result from this psychological compulsion. Under the facts of this case the strong inference of a desire to confess overcomes any possible inference that defendant's confession had been involuntary and coerced by illegal police practices.

[3]The compulsion to confess is rooted in the criminal's need to purge himself of his overbearing guilt. Various judges have acknowledged this psychological phenomenon (see Traynor, J., concurring in *People* v. *Garner* (1961) 57 Cal.2d 135, 156, 163-164 [18 Cal.Rptr. 40, 367 P.2d 680]; Lumbard, J., concurring in *United States* v. *Fay* (2d Cir. 1963) 323 F.2d 65, 69, 72; and Hale, J., in *State* v. *Bower* (1968) 73 Wn.2d 634 [440 P.2d 167, 169]), which Wigmore describes in the following manner: "The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, [the guilty person] will tell all and tell it truly. To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature... (3 Wigmore, Evidence, § 851 (Chadbourn rev. 1970) pp. 524-525.)

In psychoanalytic terms the compulsion arises out of anxiety generated by the individual's super-ego, or conscience. In a child's early years morality is governed by parents, who reward positive behavior and punish negative behavior. As the child grows older, parental ideals are internalized as a permanent part of the psychic system. This internalized parental ideology comprises the super-ego, which thereafter controls the individual's conduct from within as his parents once did from without. When the individual's behavior or thoughts fail to conform to his internal morality, the super-ego's response creates internal strife, anxiety, and a feeling of guilt. By admitting the deed the criminal relieves or eliminates his internal tension. (Reik, The Compulsion to Confess (1959) pp. 41-60, 180-216, 266-279; Guttmacher & Weihofen, Psychiatry and the Law (1952) pp. 377-379.)

While some confessions are compelled by a conscious awareness of guilt, others appear to arise impulsively without any conscious awareness of the motivating force behind the admission. In the latter instance the confession is compelled by the unconscious portion of the super-ego. The need to rid oneself of this burden of guilt is so overwhelming that criminals often provide unconscious clues which reveal themselves as the perpetrators of crime. A criminal will feel compelled to talk about the crime, to return to the scene of the crime, to seek out the police to mislead them with false information, or to drop broad hints about his secret knowledge of the crime, so that, like Dostoyevski's Raskolnikov, he may ultimately be caught and punished. As described by Theodor Reik in The Compulsion to Confess, *supra*, the criminal's "secret is stronger than his will. A counter-will, more powerful than his conscious intentions, destroys his caution. The man who commits a crime without witnesses is the only one who knows about it and it seems as if he were obliged to share this knowledge, even to impart it, as if he were unable to keep it to himself because of the growing mental tension urging him to betray it at any cost—even at that of his head. [p. 49.]...When the internal forces become unbearable, he flees to the external ones, probably because it is a mental relief to do so—a relief which is in many cases greater than his fear of punishment. In studying the psychogenesis of conscience as Freud has described it, we understand why the external forces are so much less formidable than the mental ones. The Erinyes who pursue Orestes are reincarnations of his murdered mother: from these visible but intangible beings he flees to earthly justice and suffers its punishment because it is more merciful than that terror."(P. 59.)

We conclude that the ruling of the magistrate identifying the confession as voluntary was correct, that, as he stated, there was "no express or implied threat of harshness if the defendant were to make a confession or express or implied promise of more lenient treatment." We also agree with the trial court, which after a six-week trial concluded that defendant's confession was freely and voluntarily made beyond any reasonable doubt. We adopt this conclusion as our own. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 608 [147 Cal.Rptr. 172, 580 P.2d 672].)

The judgment is affirmed.

Roth, P. J., and Beach, J., concurred.

A petition for a rehearing was denied February 26, 1980, and appellant's petition for a hearing by the Supreme Court was denied March 27, 1980.

In this manner conscience makes daredevils of us all and arms murder with a thousand tongues. The resulting confession serves to dissipate the individual's psychological strife, to ensure the punishment or disapproval sought by his super-ego, and to start the process of rehabilitation.

Reik describes the turmoil that precedes the criminal confession: "There is...an impulse growing more and more intense suddenly to cry out his secret in the street before all people, or in milder cases, to confide it at least to one person, to free himself from the terrible burden. The work of confession is thus that emotional process in which the social and psychological significance of the crime becomes preconscious and in which all powers that resist the compulsion to confess are conquered....the very work of confession betrays itself while it goes on in unconscious substitute actions, in partial confessions...Its external goal is to pave the way to confession itself...The criminal reacts with anxiety to the small signs that we recognize as unconscious self-betrayal, and [yet] he still feels them as emotional relief....The whole emotional expenditure in confession in many cases weighs only little compared with the work of confession, that painful performance in which something has to be overcome and as little as the punishment weighs compared with the suffering that originates in the super-ego. [*Id.*, pp. 267-268.]...To the criminal, [the making of the] confession means that his conscience has acquired its voice. He becomes, through the spoken repetition, conscious of the significance of his deed. In his utterances he begins to transform his mute feeling of guilt, which was inaccessible to society, into one closer to the normal one. Having freely expressed part of his need for punishment he has also declared himself deserving of punishment." (*Id.*, p. 277.)

Once given, the confession functions as a plea for absolution and for readmission to society. As put by Reik, "[c]onfession is, indeed, the criminal's first step on his way back to society. By confessing, he finds the first possibility of a return to the community after he had put himself, through his deed, outside its limits. The sentencing authorities react, too, to this rapprochement, to this first effort at reconciliation with society, by formally considering the confession as an extenuating circumstance.... [¶] In his confession, the criminal has admitted his misdeed to the community, as the child once admitted his naughtiness to his real father or to his substitute. As the confession of the child unconsciously represents a new wooing for love, an attempt at regaining the lost object, the criminal shows in his confession his intention to reenter society by declaring himself deserving of punishment. The outsider is on his painful detour back to the family of man."(*Id.*, p. 279.)