[No. A065897. First Dist., Div. Three. Sept. 27, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE VASILA, Defendant and Appellant.

**COUNSEL**

Andrian & Gallenson and Chris P. Andrian for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorneys General, Rene A. Chacon and Gregory A. Ott, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CORRIGAN, J.**—Defendant was convicted of possession and cultivation of marijuana and possession of illegal firearms. He argues the guns were

recovered as fruit of a coerced confession and, thus, should have been suppressed. We agree and reverse the firearms convictions.

*Statement of Facts*

Based upon information from defendant's estranged wife, Sheriff's Detective Smiley obtained a warrant to search for illegal guns at defendant's 200-acre farm. At approximately 8 a.m. on October 4, 1992, Smiley arrested defendant in downtown Bloomfield, informed him of his *Miranda* rights, and took him back to the farm. There, defendant assisted in opening a safe containing three-quarters of a pound of marijuana and several legal firearms. Smiley also found a large quantity of ammunition and firearm paraphernalia, along with evidence of marijuana cultivation.

About 9 a.m., defendant was taken to jail. Detective Smiley, concerned that he had not found the illegal weapons he had expected, told jail personnel that defendant was not to be given access to a phone. Smiley wanted to prevent defendant from phoning someone who might remove or destroy the weapons or pose a danger to the officers who were still searching the farm. The search concluded unsuccessfully about noon.

Around 1 p.m., Smiley brought defendant from jail to the sheriff's department for an interview. Defendant was told he could make a phone call but that Smiley would monitor the conversation. Defendant declined the offer. Special Agent Dios of the Bureau of Alcohol, Tobacco and Firearms was also present for the interview. Defendant's wife had supplied photos of illegal weapons. Smiley confronted defendant with the pictures and asked where the guns were. Defendant maintained he did not know.

When Smiley continued, clearly implying he did not believe defendant's denial, defendant expressed a desire to stop the interview.

"[Defendant]: I have nothing to say.

"[Smiley]: Are you sayin' you don't wanna talk to us at all, anymore, is that what you're saying?

"[Defendant]: (Sigh)

"[Smiley]: Or you don't wanna talk about this particular subject.

"[Defendant]: I don't, you know. I don't think I have, you know. . . anything to say."[1] The trial court ruled, and the Attorney General concedes, that defendant's response was an invocation of his right to remain silent and that the continued questioning violated *Miranda* safeguards.[2]

The investigators did not end the interview but continued instead to encourage defendant to talk about the illegal weapons. Noting that marijuana and loaded weapons were found on his property, Agent Dios told him: "George, those, that violation right there, with the dope and the guns, federally, is five years. Federal prison, no probation, no parole. I'm just tellin' you what it is. That's what it is." Smiley added: "And, what we're tryin' to do is give you a chance to tell us your side of the story, tell us the truth. . . ."

Dios then made a series of comments indicating she did not want to prosecute defendant federally: "We're not here to charge you on, on a quarter pound of dope and, and guns in the safe. That's not our job. Our job is to stop the guy who's sellin' those conversion kits." "Whoever has a AR-15[3] at this time is facing . . . that, that've been converted to fully automatic, is facing up to 20 years in federal prison. Unless they were legally registered, federally. And you can't do that in the State of California." "See, we're just trying to stop a lot of problems here right now. We're not, we're not out here to, to say, okay, George, got these guns, let me charge you federally here. You know, let me put you in federal jail. I want the guns off the street."

When defendant expressed concern for his son, who was the subject of a custody dispute between defendant and his wife, the investigators responded:

"[Dios]: Well, if he's the most important thing in the world to you . . . at this point . . . you know . . .

"[Smiley]: You'll not be seeing much of him for . . .

"[Dios]: . . . your best bet . . .

---

[1]Ellipses added by this court will be underscored to distinguish them from those originally appearing in the quoted material.

[2]Under some circumstances, the mere failure to honor an invocation may be sufficiently coercive to render a subsequent statement involuntary. (See *Miranda* v. *Arizona* (1966) 384 U.S. 436, 473-474 [16 L.Ed.2d 694, 722-723, 86 S.Ct. 1602, 10 A.L.R.3d 974].) We need not decide whether the failure to acknowledge defendant's invocation rendered the subsequent statements involuntary here, because we find threats and promises did overbear the will of defendant, otherwise compelling him to relinquish the right to silence he had tried to invoke.

[3]A reference to a semiautomatic rifle.

"[Smiley]: . . . several years.

"[Dios]: . . . is to help yourself out here."

Defendant then asked what his options were. Dios repeated that defendant was currently facing five years on potential federal charges: "That's five years hard time in federal prison. Not a chance of one day out early. . . for the dope and the gun in your safe." Dios then explained what she would be forced to do if defendant did not tell her where the guns were:

"[Dios]: I would have to write another search warrant, whose [*sic*] ever storin' your guns for you, okay? . . . [¶] And when I write the other warrant, . . . my hands are startin' to get tied now. *Because you've not told me the truth.* . . . I've had to involve the U.S. Attorney at this stage and say, Mister U.S. Attorney, uh, I got these, uh, couple of machine guns out there on the street, 'kay? We already found a guy with, yeah, it's only three-quarters of a pound of marijuana, but he had three guns in the safe with it. And then the U.S. Attorney's lights start triggering. . . when he hears those things. [¶] *At this point, he's not involved. When I have to write the warrant, I have to involve him. Now, I don't know what the state can do for you. But that's what I can do at this point and not involve the U.S. Attorney.*

"[Defendant]: Which means . . .

"[Dios]: *Which means, nothing's gonna happen to you federally. Period. But if I have to involve the U.S. Attorney* . . .

"[Defendant]: Whose houses you gonna go search?

"[Dios]: I'm not gonna tell you that information. . . . But I've got enough information right now that we can do it. And I don't wanna have to do that. Not over a couple plants of dope and a couple guns . . . ." (Italics added.)

The following interchange also took place:

"[Smiley]: Well, what do you wanna do?

"[Defendant]: What do I wanna do? I wanna go home and take a nap.

"[Smiley]: That's not gonna happen.

"[Dios]: Can't let you go home.

"[Defendant]: And I can't . . . post bail or make a phone call?

"[Smiley]: Well, eventually, yeah, you'll be able to post bail. And you can make three phone calls when you're booked. . . .

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[Smiley]: . . . But they have 12 to 24 hours to book you. They can keep you there on the first floor for a day . . . . .

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[Smiley]: You wanna sit here by yourself and think about it for awhile?

"[Defendant]: No, I can't. That'd just make it worse. I'd probably need to talk to somebody. Somebody who, who I trust. 'Cause I can't trust myself. . . right now.

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[Defendant]: Ummmmm. Probably a friend. Somebody who's sane to tell me what to do.

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[Defendant]: . . . I've been cooped up in a small room . . . for hours."

Defendant commented that if he were put in jail he would kill himself and later expressed concerns about being assaulted in prison. Dios opined as to the likely outcome of the state prosecution given defendant's background: "No felony convictions. Most of the time, first time offenders, from what I have seen on rap sheets, now I can only tell you what I've seen on rap sheets . . . they usually get probation. And I'm not talkin' for marijuana, I'm talkin' for crack . . . I'm talkin' for meth, I'm talkin' for LSD . . . heroin. They usually get probation first time. And I'm not talkin' possession, I'm talkin' sales. So you've gotta look . . . at, at what we can try and do here, you know?"

When Dios later repeated her estimation the likely outcome of the state prosecution would be probation, Smiley began to discuss the maximum penalties under California law for the charges defendant was then facing. Smiley then added his own estimation of the likely outcome: "But I can tell you that I've seen marijuana cultivation and marijuana possess for sale cases that have gotten di [*sic*], ended up with diversion, I can tell you that. I can't say that that's what's gonna happen with your case, but I have seen that happen."

Defendant and Smiley then began to strike a deal:

"[Defendant]: We can do a done deal right here right now. We can work it out. If not . . .

"[Smiley]: So tell me what, tell me exactly what you want so I can tell the D.A. If I can find one.

"[Defendant]: I want . . . probation.

"[Dios]: You don't want to go to prison.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[Smiley]: Okay, we're talking prison. We're talking the big house. We're not talking county jail.

"[Defendant]: Well, county jail's prison too. I don't want to go to jail.

"[Smiley]: You don't want to go to jail at all."

Defendant offered to plead guilty to a felony and become an informant for the investigators in order to avoid jail. Smiley then left the room to make a phone call. He returned to report the district attorney was not prepared to make a deal ahead of time. Smiley then promised defendant he would release him without bail: "The only problem . . . the only thing I can do and I'll tell you that if we get these guns back today, I'll release you. I'll release you from custody today."

Defendant expressed reservations that he would be "cutting off [his] own head." The investigators continued to encourage him by pointing out the photographs supplied by his estranged wife would prove to a jury that he was lying when he said he did not know about the illegal guns. On the other hand, they pointed out how cooperative he would appear to a jury if he gave up the weapons. Finally, both investigators reiterated their promises:

"[Smiley]: And the one promise that I can make is that if we get those guns back today, I'll release you.

"[Dios]: And I won't talk to you federally about it."

Defendant then agreed to lead the investigators to the weapons. Returning with Smiley to the farm, defendant pointed out where he had buried the guns. Defendant was promptly released from custody. The following day,

Smiley had a phone conversation with defendant in which they discussed the illegal guns.

## Discussion

Defendant argues that his statement to police on the afternoon of October 4 was involuntary and that the fruits of the statement should have been suppressed. We agree.

In order to introduce a defendant's statement into evidence, the People must prove by a preponderance of the evidence that the statement was voluntary. (*People* v. *Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042].) If a statement is found to be involuntary, the statement and other evidence derived from it are inadmissible for any purpose. (See *Oregon* v. *Elstad* (1985) 470 U.S. 298, 304-309 [84 L.Ed.2d 222, 228-232, 105 S.Ct. 1285] [wherein the court refused to extend this exclusionary rule to technical *Miranda* violations].) When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness. (*People* v. *McClary* (1977) 20 Cal.3d 218, 227 [142 Cal.Rptr. 163, 571 P.2d 620], overruled on other grounds in *People* v. *Cahill* (1993) 5 Cal.4th 478, 509-510, fn. 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037].)

We rely upon the cardinal rule of the Supreme Court regarding the admission of a defendant's statement: "[W]here a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law. [Citation.]" (*People* v. *Boyde* (1988) 46 Cal.3d 212, 238 [250 Cal.Rptr. 83, 758 P.2d 25].) This rule raises two separate questions: was a promise of leniency either expressly made or implied, and if so, did that promise motivate the subject to speak? Here, we answer both questions in the affirmative.

On appeal, the question of voluntariness is viewed "in light of the record in its entirety, including 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation' . . . ." (*People* v. *Benson* (1990) 52 Cal.3d 754, 779 [276 Cal.Rptr. 827, 802 P.2d 330], quoting *Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041].) In cases specifically concerning the making of improper promises by interrogators, this "totality of the circumstances" test has had an uneven application. Consequently, the question arises whether the making of an improper promise renders a confession involuntary per se or whether, despite the making of an improper promise, the confession may still

be voluntary under the totality of the circumstances. Many of the Supreme Court cases on this subject do not explicitly articulate the test. (See, e.g., *People* v. *Boyde, supra,* 46 Cal.3d at pp. 238-239; *People* v. *Jimenez* (1978) 21 Cal.3d 595, 611-613 [147 Cal.Rptr. 172, 580 P.2d 672], overruled on other grounds in *People* v. *Cahill, supra,* 5 Cal.4th at pp. 509-510, fn. 17.) Other cases that do invoke the test do not delineate how the test is being applied. (See, e.g., *People* v. *Benson, supra,* 52 Cal.3d at pp. 778-782; *In re Shawn D.* (1993) 20 Cal.App.4th 200, 208-216 [24 Cal.Rptr.2d 395]; *People* v. *Andersen* (1980) 101 Cal.App.3d 563, 579-584 [161 Cal.Rptr. 707].) Both sets of cases apply the "totality of the circumstances" test by implication to the second prong of the analysis: whether the improper promise caused the giving of the statement. Thus, we conclude an improper promise of leniency does not render a statement involuntary unless, given all the circumstances, the promise was a motivating factor in the giving of the statement. We consider the two prongs of the analysis in turn.

### A. *Was a Promise of Leniency Made?*

■ When determining whether a promise of leniency was made, a crucial distinction is drawn between simple police encouragement to tell the truth and the promise of some benefit beyond that which ordinarily results from being truthful. "When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible." (*People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].)

■ Here, defendant was repeatedly encouraged by the investigators to tell the truth and was given to understand that a truthful statement would be to his advantage. This type of encouragement is permissible. However, the investigators went beyond encouragement and both expressly and impliedly promised additional benefits to defendant if he told them where the guns were hidden. Specifically, Dios promised defendant she would not institute federal prosecution, and Smiley promised he would release defendant on his own recognizance.

The Attorney General contends that the officers kept their promises and that only false promises of leniency are coercive. He relies on *People* v. *Andersen, supra,* 101 Cal.App.3d at page 576, in support of this view, but his

reliance is misplaced. The *Andersen* court did make reference in dictum to certain agreements the government may enter into with a suspect. "[T]rue promises of leniency are not proscribed when made by persons authorized to make them, as for example promises of immunity or pardon extended to witnesses in return for testimonial confessions, and promises of reduced charges or reduced sentences tendered . . . by plea bargains . . . ." (*Id.* at p. 575.)

None of these circumstances was present here. This case did not involve an arm's-length negotiation of testimony for consideration or a plea bargain. In fact, the prosecutor was contacted and refused to enter into such an agreement. Instead, defendant was given bald promises that, if he provided the necessary information, he would not be prosecuted federally and would be released from custody. The converse was also threatened. It was made quite clear that if defendant was not forthcoming, federal prosecution was a very real possibility. In addition, he would be held in custody and not be able to make bail or phone calls for another 12 to 24 hours.

Indeed a thorough reading of *Andersen* reveals the conduct of the officers here fails to pass muster. In *Andersen*, the defendant was admonished three times, and the police followed all *Miranda* requirements. Additionally, there was no evidence that the defendant was worn down by fatigue or physical pressure, and the officers were described as "Chesterfieldian" in their courtesy toward their suspect. (*People* v. *Andersen, supra,* 101 Cal.App.3d at pp. 577-578.) Here, defendant's invocation was ignored; he indicated he was fatigued to the point that he did not trust his own judgment, and his interrogators made both implied threats and blatant promises.

The Attorney General urges us to conclude from the *Andersen* dictum that officers are permitted to induce a confession by making promises, so long as they keep them. This is not the law, nor does *Andersen* make it so.

*In re J. Clyde K.* (1987) 192 Cal.App.3d 710, 714-715 [237 Cal.Rptr. 550] (disapproved of on other grounds in *People* v. *Badgett* (1995) 10 Cal.4th 330, 349-350 [41 Cal.Rptr.2d 635, 895 P.2d 877]) is instructive. There, an officer stopped three juveniles on suspicion of burglary. The officer promised them, if they told the truth, they would receive only a citation but, if not, they would be booked. One of the three confessed that they had committed the burglary. The officer kept his promise and released that juvenile with a citation. The confession was later found to be involuntary in a prosecution of the other two juveniles, despite the fact that the inducing promise was honored and the confessor released. (192 Cal.App.3d at p. 722.)

The California Supreme Court has never distinguished between promises of leniency based on whether the promises were kept. "It is well settled that

a confession is involuntary and therefore inadmissible if it was elicited by *any* promise of benefit or leniency whether express or implied. [Citations.]" (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 611, italics added.) In *Jimenez,* the defendant's statement was made involuntary by the implied promise that he would not be subject to the death penalty if he cooperated. (*Id.* at p. 613.) Although, in fact, Jimenez was not charged with a capital offense, his statement was nonetheless involuntary because it had been "motivated by the benefits implied" by the officer. (*Ibid.*)

The issue is not whether a commitment was honored, but rather whether governmental agents have coerced a citizen to give testimony against himself. When the government does so, it deprives that citizen of a right assured to him by the Fifth Amendment. Whether the coercion is based on a promise kept or repudiated can only truly be tested in hindsight, but it constitutes coercion under either scenario.

### B. *Was the Promise a Motivating Factor?*

Having determined that impermissible threats and promises were made, we turn to the question of whether they were the "motivating cause" of defendant's statement. (*People* v. *Johnson* (1969) 70 Cal.2d 469, 478 [74 Cal.Rptr. 889, 450 P.2d 265]; *People* v. *Benson, supra,* 52 Cal.3d at pp. 778-779.) Here, we look to " 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation' . . . ." (*People* v. *Benson, supra,* 52 Cal.3d at p. 779.) When considering the characteristics of the accused, we look to his "age, sophistication, prior experience with the criminal justice system and emotional state." (*In re Shawn D., supra,* 20 Cal.App.4th at p. 209.) At the time of the statement, defendant was 36 years old. He held an electrical contractor's license, had some college education, was married to a physician, owned extensive property, and had a prior misdemeanor conviction for gun possession. Nothing about these personal circumstances suggests that defendant was naive, incapable, or particularly vulnerable to the investigators' promises.

However, considering all the details of the interrogation, the promises clearly motivated defendant's decision to lead investigators to the weapons. The turning point in the interrogation appears to have been Smiley's promise that defendant would be released on his own recognizance that day. Curiously, the Attorney General contends that defendant was motivated only by his desire to get out of custody and not by the promises of the investigators. Yet, this contention fails to recognize that one of the investigators' promises catered to defendant's primary motivation. Defendant was explicitly told he would be released from custody if he revealed where the weapons were.

Conversely, he was told he could be held for 12 to 24 hours without the opportunity to make phone calls or post bail. We are satisfied, upon review of the entire conversation, that defendant was improperly coerced by the officers' conduct.

Defendant's decision to lead Smiley to the illegal weapons was, therefore, involuntary. Consequently, the weapons should have been suppressed as the fruits of an unlawful interrogation. Additionally, without the recovery of the weapons, the conversation between defendant and the investigator the following day would never have transpired. The next day, the officer exploited the information he had improperly acquired the day before. Here, there is no evidence sufficient to dissipate the taint of the initial illegal conduct. Thus, that second conversation, too, is the inadmissible fruit of the unlawful interrogation. (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 108 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People* v. *Montano* (1991) 226 Cal.App.3d 914 [277 Cal.Rptr. 327].) We are persuaded that the admission of the weapons and any statements about them was not harmless beyond a reasonable doubt. (*People* v. *Cahill, supra*, 5 Cal.4th at pp. 509-510.) Without that evidence, it is reasonably likely the court would not have convicted defendant of the weapons-related offenses.

## Disposition

Defendant's convictions of the weapons-related offenses are reversed. Our ruling does not affect his conviction of marijuana cultivation and possession. The cause is remanded for resentencing and/or retrial.

Chin, P. J., and Merrill, J., concurred.