Filed 1/24/23  P. v. Guevara CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LORENZO GUEVARA,<br><br>    Defendant and Appellant. | A165852<br><br>(Kings County<br>Super. Ct.<br>No. 17CMS1626) |

Lorenzo Guevara appeals from convictions of multiple offenses committed against his wife, daughter and stepdaughter.  He contends a police officer's promise of leniency rendered his confession involuntary, a number of convictions must be reversed due to the trial court's failure to instruct on a lesser offense for certain counts and erroneous instructions on another, and there was insufficient evidence to support several of the convictions and special allegations.  He further contends the consecutive sentences imposed on two offenses violated the prohibition against multiple punishment and resentencing on one count is required by new legislation enacted subsequent to his sentencing.

We will affirm the convictions but conclude one of the jury's findings must be stricken and the upper term sentence on one count must be vacated. As a result, resentencing is required.

# BACKGROUND

L.D. met Guevara in Mexico and married him there in about 2005. When they met, L.D. had a daughter, Y.D., who had been born in 2001. In 2007, L.D. moved to the United States but left Y.D. in Mexico with her grandparents. L.D.'s younger daughter, D.G., was born in 2008. The family first lived in Riverside, then moved to Avenal in 2010. Y.D. came to live with them in 2017, when she was 15 years old.[1]

## I.

### *Offenses Against L.D.*

L.D. testified that Guevara forced her to have sex with him six times when she did not want to and had told him no. She testified that Guevara would grab her hands by force, turn her face down and put his penis in her anus, causing her to bleed. This happened twice in Riverside (once right after D.G. was born) and four times in Avenal (in two different houses). L.D. did not report the rapes.

L.D. testified that she had wanted a divorce since 2008, after D.G. was born. She told Guevara many times that she wanted to leave him, and he responded that he would kill her if she left. Asked how this made her feel, L.D. replied, "I felt very impatient," then when asked if she was scared, she responded "[f]rom him, yes" and testified that she believed him. Asked why she stayed with Guevara after he raped her the second time, L.D. replied, "[b]ecause of my children."

L.D. testified that Guevara did not like her to go out. To stop her from leaving, all the windows of the house were bolted so she could not open them,

---

[1] Guevara used the services of a court certified Spanish interpreter throughout the proceedings. L.D. and Y.D. testified with the assistance of an interpreter. D.G. did not use an interpreter.

the front door had a lock that could only be opened from the outside and Guevara would lock the back door and take the key with him when he left. Guevara twice locked L.D. and the children in the house when he went to work.

## II.

### *Offenses Against Y.D.*

Prior to June 2017, L.D. worked from 6 p.m. to 6 a.m. Guevara, who worked during the day, took care of the children while L.D. was at work. One day in June 2017, Y.D. asked L.D. not to go to work because Guevara was abusing her. Y.D. appeared scared and she showed L.D. a "glass of bullets," saying Guevara had given it to her. L.D. called the police.

Around this time, L.D. was having an extramarital affair, and she and Guevara had had a conversation about this before the day she called the police. L.D. testified that she and Guevara "no longer had a relationship as a couple" because of him abusing her. She had not suspected he was harming the children, however, until a few weeks before, when she "noticed him very strange": She came home early and found Guevara in the children's room, and she found drugs on him. She never saw him harm her children.

Y.D., who was 18 years old at the time of trial, testified that everything was fine when she first came to live in Avenal, but starting a couple of weeks later, Guevara would come into her room when she was sleeping and touch her vagina and other parts of her body. He touched her vagina and anus with his penis more than 30 times during the time they lived in Avenal. Her vagina and anus would bleed when Guevara raped her, and her anus hurt so that she "couldn't even sit down."

Y.D. testified the first time "something had happened" in Avenal, "he got some drugs, he would give them to me so I would have sex with him."

3

Guevara would come into her bedroom and give her drugs, cocaine and "crystal," forcing her to take the drugs and have sex with him by threatening her with a gun. Guevara had the gun in his hand every time he raped her; he would point it at her and "say that—to have relations with him." She described the gun as a silver revolver with a wood handle and identified the gun found by the police as the one Guevara threatened her with. She testified that the bullets in her bedroom were Guevara's and that she "took them away [¶] . . . [¶] one time that he was drunk and drugged."

Y.D. described a time soon after she moved to Avenal when Guevara put pornography on the TV, grabbed her and said he wanted to have sexual relations with her and, when she said "no," grabbed her by force, pulled down her pants and his own, and put his penis in her vagina and in her anus. She bled from her vagina and anus. Y.D. testified that this incident was the first time "something happened" in Avenal. Asked where it occurred, Y.D. responded, "[i]n my room." When the prosecutor asked further questions about "[t]hat time in the living room where he put on pornography," however, Y.D. accepted the characterization of the incident and did not say anything about the reference to it having occurred in the living room rather than in her bedroom.

Y.D. described an occasion in her bedroom when she had taken drugs and Guevara grabbed her by force, put his penis in her vagina and in her anus, ejaculated in her vagina and touched her breasts and her vagina with his hands. Guevara also ejaculated on the carpet in Y.D.'s bedroom.

The day the police came to the house and Guevara was arrested, Y.D. had been taking a shower in her mother's bathroom when Guevara got in with her, grabbed her hands and "put his penis in [her] vagina by force" as

4

she tried to push him away.  He also touched her breasts, started to put his penis in her anus and touched her vagina with his hands and mouth.

Toward the end of the time they lived in Avenal, when Guevara was drinking, he told Y.D. that he abused her in Mexico when she was five years old.  She remembered him grabbing her by her hair and placing her mouth on his penis.

### III.

### *Offenses Against D.G.*

L.D. testified that one day when D.G. was about six years old, she came into a room and saw Guevara with his hand on D.G.'s anus:  They were on the bed, D.G.'s underwear was "down," and Guevara was holding D.G.'s feet up with one hand while his other hand was under her "butt" with the middle finger straight out.  D.G. said Guevara was putting his finger "on her butt" and Guevara said that was not true, he was cleaning her.  L.D. did not call the police because Guevara told her it was not true, and it was impossible for her to believe he was molesting D.G.

D.G. was 11 years old at the time of trial.  She testified that the first time she remembered Guevara touching her sexually, she had fallen asleep on the couch and was awakened by Guevara kissing her mouth.  She noticed her pants were down, tried to push Guevara away and went to her room.  Another time, D.G. and her brother were playing at a friend's house when Guevara picked D.G. up, left her brother at the friend's and took D.G. home.  In the living room, Guevara pulled his pants down, pushed D.G.'s head toward his "privates" and tried to "make me put it in the mouth," but D.G. turned her head and his "private part" hit her cheek.  She ran away.  On another occasion, as D.G. was sitting on the bed in Guevara's room counting coins, he came from behind her and grabbed her shoulders, startling her.  She

5

did not remember much of what happened next, but his "private part" touched her "butt" and "went inside." It hurt, and when she went to the bathroom "it came out blood." In another incident, while D.G. was in the living room trying to fix the TV, Guevara came from behind her, got on top of her and took off his pants, and she felt his "private part" on her "bottom," over her clothes. She kicked him and ran to her room. Another time, Guevara took off his pants, pulled down D.G.'s and touched her "private part" with his "private parts." Asked how many times Guevara touched her in "these ways that made you uncomfortable," D.G. responded "[a] lot" but said she did not remember the rest.

## IV.

### *Guevara's Statements*

Guevara was interviewed at the police station by Sergeant Carr, with a Spanish-speaking officer translating. The interview was recorded but no recording was put in evidence or played for the jury; Carr described the interview in his testimony.

Carr testified that Guevara said he did not know why he was at the police station and denied ever doing anything to hurt his family. Guevara said he had a caring relationship with the children, protecting them and acting as their father, and that he was affectionate with D.G. but did not kiss or hug Y.D. He said D.G. sometimes slept with him. The night before, he had fallen asleep on the floor of the living room with D.G.; Y.D. came in and asked if she could sleep with them as well, and he told her to ask her mother.

Guevara initially denied owning a gun. When told the police had searched the house and found one, he admitted having it but said he kept the ammunition separate, the children had not seen the gun and his wife did not know about it. Guevara said he had a consensual sexual relationship with

6

L.D. and they had last had sex two weeks to a month before. Asked about the locks on the doors of the house, Guevara said they were because Y.D. sleep-walked, denied locking the family in the house when he left, and said the lock was on backwards to protect the family and L.D. had a key.

Sergeant Carr advised Guevara that he had information Guevara had been inappropriate with the children in the family and told him "if he had problems, he needed to be honest where he could get some help." Carr told Guevara about the suspected DNA evidence on the carpet and Guevara said he had masturbated in Y.D.'s bedroom. When Carr said Y.D. had told him she was present when this happened, Guevara said he did not know how she would have seen it and started to act "a little nervous," his leg shaking and his lip "curled down as if he was sad." Carr told Guevara to stop telling him lies and Guevara said he would, then said he masturbated and Y.D. saw him doing it. He knew Y.D. was 15. He said he had been having consensual sex with Y.D. since she moved into the house in December, and that he initiated it; he maintained the sex was consensual throughout the interview, including when told Y.D. said she was forced and after admitting he had once forced L.D. to have sex. He first said he and Y.D. had sex three times, then later said it was 10 to 15 times. He said he had anal sex with Y.D. two or three times, said the last time they had sex was two days before the interview, then said they had sex the night before the interview.

Guevara denied ever threatening Y.D. He said Y.D. did not know about the gun, then later said he sent her pictures of the gun because she wanted to see it. According to Carr, when he asked Guevara why Y.D. was scared of him, Guevara said she was probably scared of her mother, then when Carr told him Y.D. was specifically scared of him, Guevara said, "I deserve it, I need help." Carr did not clarify exactly what Guevara meant by this.

7

Guevara mentioned AA a few times during the interview and said he "needed to take pills or something."

Guevara admitted having forced L.D. to have sex about four years before, said it was wrong of him to do this, and said recently they had had consensual sex. While discussing L.D., Guevara again made a statement about needing help.

Guevara initially denied anything happening with D.G., then said he had touched her vagina with his hand. Carr asked if he penetrated D.G. and Guevara said he did but "didn't tear anything." Guevara said he touched D.G. two times and did it to "make himself feel good in that moment." He said the girls performed oral copulation on him, that Y.D. wanted to do it and that D.G. "didn't say yes, but she also didn't say no." He said he would give D.G. money for the oral copulation. He also said he once tried to insert his penis into D.G.'s vagina while she was "face down" but was unable to. Carr asked whether Guevara thought an eight year old would want to have sex, and Guevara said, "she did it because he would pay her money to do things."

## V.

### *Physical Evidence*

Police officers who responded to the family home observed that the lock on the front door was on "backwards," with the "key part" facing inside so "you would need a key to get out." The back door had a padlock on top, preventing the door from being opened, and there were nails in the window frames that prevented opening the windows.

A search of the house revealed a .38-caliber firearm and methamphetamine inside a personal safe. Ammunition for the firearm was found inside the revolver and in the trunk of a vehicle in the driveway. Ammunition of a different type was found on the nightstand in Y.D.'s

8

bedroom. In Y.D.'s bedroom, a portion of the carpet was illuminated with a blue light used to find DNA. The parties stipulated that analysis of a sample from the carpet showed the presence of semen containing "the same DNA make up as the preference profile of" Guevara, a result "expected to occur in a randomly selected individual in approximately one in 580 non [*sic*] million African Americans. 132 non [*sic*] million Caucasians. And 1 in 180 octillion Hispanics." Analysis of a swab taken from Y.D.'s right breast during a sexual assault exam showed Guevara to be the major contributor and Y.D. the minor contributor, a result expected in a randomly selected individual in "approximately 1 in 2.6 quintillion African Americans. 1 in 820 quintillion Caucasians, and 1 in is [*sic*] 13 quintillion Hispanics."

## VI.

### *The Trial*

Guevara was charged with three offenses against L.D., nine against Y.D. and five against D.G. As to L.D., the information charged spousal rape (Pen. Code, § 262, subd. (a)(1))[2] (count 1), criminal threats (§ 422, subd. (a)) (count 2), and false imprisonment by violence (§ 236) (count 3). As to Y.D., appellant was charged with two counts of forcible sodomy (§ 286, subd. (c)(2)(A) (count 4) and (c)(2)(C) [minor 14 years of age or older]) (count 9), two counts of criminal threats (§ 422, subd. (a)) (counts 5 and 11), two counts of committing a lewd act on a child over age 14 (§ 288, subd. (c)(1)) (counts 6 and 10), forcible oral copulation of a minor over age 14 (§ 288a, subd. (c)(2)(C)) (count 7), and two counts of forcible rape (§ 261, subd. (a)(2)) (counts 8 and 12). As to D.G., appellant was charged with forcible sexual

---

[2] Further statutory references will be to the Penal Code unless otherwise specified.

Section 262 was repealed effective January 1, 2022. (Stats. 2021, ch. 626, § 20.)

penetration of a child under the age of 14 (§ 289, subd. (a)(1)(B)) (count 13), two counts of committing a lewd act on a child under the age of 14 (§ 288, subd. (a)) (counts 14 and 16), attempted oral copulation of a person under age 14 (§ 664/288a, subd. (c)(1)) (count 15), and forcible sodomy of a minor under age 14 (§ 286, subd. (c)(2)(B)) (count 17). The information further alleged that Guevara personally inflicted bodily harm on a victim under the age of 14 in the commission of counts 15 to 17 (§ 667.61, subds. (a), (d) & (j)(1)), committed the offenses against more than one victim (§ 667.61, subds. (a) & (e)(4)) and administered a controlled substance to Y.D. (§ 667.61, subds. (a) & (e)(6)).

The jury found Guevara guilty on all 17 counts and found the special allegations true on all applicable counts except count 7, as to which it found the drug administration allegation not true.[3]

Guevara was sentenced to an indeterminate term of 210 years to life plus a determinate term of eight years: Consecutive terms of 25 years to life on counts 4, 8, 9, 12, 16 and 17, consecutive terms of 15 years to life on counts 1, 7, 13 and 14, a consecutive four-year upper term on count 15 and consecutive one-third middle terms of eight months on counts 2, 3, 5, 6, 10 and 11.

---

[3] Section 667.61 increases the punishment for specified sexual offenses committed under specified circumstances. Consistent with the statutory provisions, the multiple victim allegations (§ 667.61, subd. (e)(4)) were presented to the jury only in connection with counts 1, 4, 7, 8, 9, 12, 13, 14, 16 and 17; the drug administration allegations (§ 667.61, subd. (e)(6)) were presented to the jury in connection with counts 4, 7, 8, 9 and 12; and the bodily harm allegations (§ 667.61, subd. (d)(7)) were presented to the jury in connection with counts 16 and 17.

# DISCUSSION

## I.

### *Guevara's Challenge to Admission of His Confession Was Forfeited.*

#### A. General Principles

Guevara contends his convictions must be reversed due to the admission of his confession, which he maintains was rendered involuntary by Carr's express or implied promise of leniency. The claim is based on Carr's affirmative response ("Yes, ma'am") to the prosecutor's question, "Did you tell him that he had—if he had problems he needed to be honest where he could get some help?"

"Both the federal and state Constitutions bar prosecutors from introducing into evidence a defendant's involuntary statement to government officials. (*People v. Holloway* (2004) 33 Cal.4th 96, 114 (*Holloway*).) This prohibition bars the admission of an involuntary confession, as well as an involuntary admission. (*People v. Haydel* (1974) 12 Cal.3d 190, 197.) In determining whether a statement is involuntary, 'we consider the totality of the circumstances to see if a defendant's choice to confess was not " ' " 'essentially free' " ' " because his will was overborne by the coercive practices of his interrogator.' (*People v. Spencer* (2018) 5 Cal.5th 642, 672 (*Spencer*).) Coercive police conduct includes physical violence, threats, direct or implied promises, or any other exertion of improper influence by officers to extract a statement. (*People v. Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*).) The presence of coercion is a necessary, but not always sufficient, predicate to finding a confession was involuntary. (*People v. Caro* (2019) 7 Cal.5th 463, 492.) We also consider other surrounding circumstances apparent from the record, including both the details of the interrogation and the characteristics of the accused. (*Ibid.*)" (*People v. Battle* (2021) 11 Cal.5th 749, 790.)

" 'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. . . . Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, "if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. . . ." ' [Citations.]" (*Holloway*, *supra,* 33 Cal.4th at p. 115.)

## B. Guevara Failed to Seek Suppression.

Defense counsel did not move to suppress Guevara's statement to the police or otherwise object to its admission. The issue was therefore forfeited. (*People v. Ray* (1996) 13 Cal.4th 313, 339 (*Ray*).)

Guevara asks us to exercise our discretion to reach the issue even if we find it was forfeited. (*People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6.) We find it inappropriate to do so. Without a recording of the interview in the record, Carr's testimony is the only available evidence of what was said. Guevara's claim is based entirely on Carr's affirmative response to a single question framed by the prosecutor, "Did you tell him that . . . if he had problems he needed to be honest where he could get some help?" " 'Whether a confession was voluntary depends upon the totality of the circumstances.' [Citation.]" (*People v. Linton, supra,* 56 Cal.4th at p. 1176.) We have no basis

for evaluating those circumstances.  As in *Ray*, because the confession was not challenged in the trial court, "the parties had no incentive to fully litigate this theory below, and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings.  Under such circumstances, a claim of involuntariness generally will not be addressed for the first time on appeal."  (*Ray, supra,* 13 Cal.4th at p. 339.)

## C. Guevara Failed to Establish Ineffective Assistance of Counsel.

Anticipating this conclusion, Guevara contends his attorney's failure to move to suppress the confession constituted ineffective assistance of counsel. We are not persuaded.

To establish ineffective assistance of counsel, Guevara "must demonstrate both deficient performance under an objective standard of professional reasonableness and prejudice under a similarly objective standard of reasonable probability of an adverse effect on the outcome." (*People v. Waidla* (2000) 22 Cal.4th 690, 718.)  "Because we are limited to the record on appeal, we must reject the contention that counsel provided ineffective assistance if the record sheds no light on why counsel acted or failed to act in the manner challenged unless (1) counsel was asked for and failed to provide a satisfactory explanation or (2) there simply could be no satisfactory explanation."  (*People v. Burgener* (2003) 29 Cal.4th 833, 880.)

Here, a satisfactory explanation is possible:  Counsel could have concluded a suppression motion would not be meritorious.  "[D]efense counsel's decision not to file a motion he believes will be futile does not ' " 'substantially impair' . . . defendant's right to effective assistance of counsel." ' "  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 804.)

Guevara maintains that Carr made a promise of leniency by telling him he could "get help" if he was "honest."  In his view, the fact that he "said 'a

few times' that he 'need[ed] help' " shows he understood Carr's promise of leniency and the promise was a motivating factor for him to make incriminating statements. (*People v. Vasila* (1995) 38 Cal.App.4th 865, 874 [improper promise of leniency renders statement involuntary only if promise was motivating factor in giving the statement].) Guevara reads too much into the record.

After asking Carr about Guevara's responses in the early part of the interview, in which Guevara said he did nothing to hurt his family, the prosecutor asked if Carr told Guevara he had information that Guevara had been "inappropriate with the children in this family." Carr said "yes," the prosecutor asked if Carr told appellant "if he had problems he needed to be honest where he could get some help," and Carr again said "yes." The prosecutor then asked Carr about confronting Guevara with the DNA evidence from the carpet in Y.D.'s room. Carr testified that Guevara initially said he had masturbated in Y.D.'s bedroom, then after Carr said Y.D. had told him she was there, Guevara said he did not know how Y.D. "would have seen it" and started to act nervous. At this point, Carr told Guevara to stop telling lies; Guevara agreed and said Y.D. saw him masturbating. Responding to questions about having sex with Y.D., Guevara said he initiated the sexual relationship but insisted it was consensual, said they had sex three times then later said it was 10 to 15 times, denied threatening Y.D. or her knowing about his gun, then acknowledged that she did know about it, and suggested Y.D. was scared of her mother.

Carr testified that it was when Carr told Guevara that Y.D. was scared of him, not L.D., that Guevara said, "I deserve it, I need help." After Carr testified that he did not clarify exactly what Guevara meant by this, the prosecutor asked, "This phrase about him needing help, did he say AA one

14

time, or more than one time?" Carr replied, "He said it a few times during the interview." The prosecutor then asked, "Other than saying he needed help, did he make any other statements similar to that?" Carr responded, "He said that he needed to take pills or something." Guevara again made "that statement about needing help" while discussing his having forced L.D. to have sex four years prior.

The record does not support Guevara's claim that Carr's direction to tell the truth so he could get help amounted to a promise of leniency. Carr did not indicate there was any discussion of the potential for, much less a promise of, " ' "lenient treatment at the hands of the police, prosecution or court in consideration of making a statement." ' " (*Holloway, supra,* 33 Cal.4th at p. 115.) By contrast, for example, in *People v. Vasila, supra,* 38 Cal.App.4th at page 874, one investigator "promised defendant she would not institute federal prosecution" and another "promised he would release defendant on his own recognizance." In *People v. Perez* (2016) 243 Cal.App.4th 863, 866, the interrogating officer told the defendant that if he told the truth and was honest, " 'we are not gonna charge you with anything.' " In *In re Shawn D.* (1993) 20 Cal.App.4th 200, 214-215, officers "repeatedly suggested that appellant would be treated more leniently if he confessed" by means including telling him it would be noted in the police report if he was honest and cooperative, implying he would go to jail if he continued lying but if he stopped lying he would be able to see his girlfriend and baby, suggesting he would be treated as less culpable if he explained his role in the offense, and implying that if he helped the police recover stolen property they would try to ensure he was tried as a juvenile and not as an adult.

15

The record in the present case reflects neither express promises of leniency nor statements from which "the only reasonable implication" is that the defendant "would be treated more leniently if he confessed." (*In re Shawn D., supra,* 20 Cal.App.4th at p. 214.) It appears from Carr's testimony that he advised Guevara "if he had problems" he "needed to be honest where he could get some help" after informing him that the police had information about Guevara's "inappropriate" conduct with the children in the family. This may have been no more than a statement that if Guevara did what he was accused of doing because he had "a problem," he would not be able to get help unless he acknowledged the problem and conduct. Guevara's statements that he needed help—with references to "AA" and "pills" that there is no indication Carr suggested—may have simply reflected Guevara's own recognition that his forceful sexual conduct with his wife and daughters was the result of a problem he needed help addressing. Absent evidence to suggest Guevara understood Carr to be indicating the "help" he needed would come in the form of lenient treatment by the police, prosecution or courts—of which there is none—Carr may simply have been advising Guevara that "a truthful statement would be to his advantage." (*People v. Vasila, supra,* 38 Cal.App.4th at p. 874.) As "[t]his type of encouragement is permissible" (*ibid.*), defense counsel could have concluded there was no basis for a claim that it rendered Guevara's confession involuntary. Guevara has not sustained his burden of proving he received ineffective assistance of counsel.

## II.

### *Instructions on Sexual Battery As a Lesser Included Offense of Charged Forcible Sexual Offenses Were Not Required.*

Guevara next contends the trial court erred in failing to instruct sua sponte on sexual battery as a lesser included offense in counts 1 (spousal rape), 4 (forcible sodomy), 7 (forcible oral copulation), 8 (forcible rape), 9

16

(forcible sodomy), 12 (forcible rape), 13 (forcible sexual penetration), 15 (attempted oral copulation) and 17 (forcible sodomy).  He acknowledges that the evidence supported the charged forcible offenses but argues that his statements to the police provided evidence that he committed the sexual offenses without force or threats, thus supporting instructions on sexual battery.

### A.  General Principles

" ' "The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense.' " [Citation.]  As we have explained, instructing on lesser included offenses shown by the evidence avoids forcing the jury into an 'unwarranted all-or-nothing choice' [citation] that could lead to an unwarranted conviction.  [Citations.]" (*People v. Hughes* (2002) 27 Cal.4th 287, 365.)  " ' "[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." ' [Citation.]" (*People v. Woods* (2015) 241 Cal.App.4th 461, 474.)

" 'An offense is necessarily included in another if . . . the greater statutory offense cannot be committed without committing the lesser because all of the elements of the lesser offense are included in the elements of the greater.' [Citation.]  In other words, when the greater crime 'cannot be committed without also committing another offense, the latter is necessarily included within the former.' [Citation.]" (*People v. Hughes, supra,* 27 Cal.4th at p. 365.)  Two tests are used " 'in determining whether an uncharged offense is necessarily included within a charged offense:  the "elements" test

17

and the "accusatory pleading" test.  Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former.  Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.' " (*People v. O'Malley* (2016) 62 Cal.4th 944, 984; *People v. Smith* (2013) 57 Cal.4th 232, 240.)

We review de novo a claim that the trial court failed to instruct on a lesser included offense.  (*People v. Licas* (2007) 41 Cal.4th 362, 366.)  "[T]he question is not whether substantial evidence supports [the defendant's] conviction on the greater offenses" but "whether, in assessing and weighing the evidence independently, the jury could have reasonably concluded that [the defendant] committed [the lesser offense] but not [the greater offense]." (*People v. Woods, supra,* 241 Cal.App.4th at p. 475.)  "Any error in failing to instruct on a lesser included offense does not warrant reversal unless an examination of the entire cause, including the evidence, discloses that 'it appears "reasonably probable" the defendant would have achieved a more favorable result had the error not occurred.' [Citations.]  A reasonable probability in this context does not mean more likely than not; it means a reasonable chance and not merely a theoretical or abstract possibility." (*Id.* at p. 474.)

### B.  Sexual Battery Is Not a Lesser Included Offense of Forcible Rape, Forcible Sodomy or Forcible Oral Copulation.

Section 243.4, subdivision (a), provides:  "(a) Any person who touches an intimate part of another person while that person is unlawfully restrained by the accused or an accomplice, and if the touching is against the will of the person touched and is for the purpose of sexual arousal, sexual gratification,

18

or sexual abuse, is guilty of sexual battery." This offense is punishable as either a felony or a misdemeanor. (*Ibid.*)

Guevara argues that instructions on sexual battery were required under the accusatory pleadings test. Guevara points out that his statements to the police admitted the sexual acts but denied use of force or threats, and that count 3 charged him with unlawfully restraining L.D. As to count 1, he suggests the jury could have concluded he did not use the force required for spousal rape but did unlawfully restrain L.D., thereby committing sexual battery by touching L.D.'s intimate part, against her will, while he restrained her. Guevara further argues the unlawful restraint of L.D. extended to Y.D. and D.G. (who were locked in the house with her), making sexual battery a lesser offense of the forcible sexual offenses against Y.D. and D.G. under the same reasoning.

Guevara also argues that if the pleading of unlawful restraint against L.D. did not extend to Y.D. and D.G, instructions on misdemeanor sexual battery were required. Section 243.4, subdivision (e)(1), defines "misdemeanor sexual battery" as "touch[ing] an intimate part of another person, if the touching is against the will of the person touched, and is for the specific purpose of sexual arousal, sexual gratification, or sexual abuse"—i.e., absent the restraint required for felony sexual battery. Guevara acknowledges that the jury was instructed on misdemeanor simple battery (§ 242) as a lesser offense on counts 1, 4, 7, 8, 9, 12, 13, 15 and 17, but argues that misdemeanor sexual battery "more closely calibrated the choice between a verdict no harsher or more lenient than the evidence merited" because the touching was of the victim's intimate parts and therefore went beyond the "slightest touching in a harmful or offensive manner" (see CALCRIM No. 960) required for simple battery.

19

With respect to most of the counts at issue, Guevara's argument fails because sexual battery is not a lesser included offense of the charged counts. Sexual battery is a specific intent offense: It requires that the touching be "for the purpose of sexual arousal, gratification, or abuse." (§ 243.4; *People v. Muniz* (1989) 213 Cal.App.3d 1508, 1517.) With a single exception, the offenses charged in the counts at issue are *general* intent crimes. (*People v. Mendoza* (2015) 240 Cal.App.4th 72, 79 [sodomy]; *Muniz,* at p. 1517 [oral copulation]; *In re Alberto S.* (1991) 226 Cal.App.3d 1459, 1464 [rape].) "Generally, a crime which requires specific intent cannot be a lesser included offense of a general intent crime." (*In re Alberto S.,* at p. 1464.) *Muniz* held that sexual battery is not a lesser included offense of forcible oral copulation because the proof of a specific intent or purpose required for sexual battery ("for the purpose of sexual arousal, gratification, or abuse") is not required for proof of forcible oral copulation. (*Muniz,* at p. 1517.) The same reasoning applies with respect to rape and sodomy.[4]

### C. Instructions on Sexual Battery As a Lesser Offense of Sexual Penetration Were Not Supported by the Evidence.

Unlike the other charged offenses, forcible sexual penetration is a specific intent crime because the act of penetration must " 'be done with the intent to gain sexual arousal or gratification or to inflict abuse on the victim.' " (*People v. ZarateCastillo* (2016) 244 Cal.App.4th 1161, 1167, quoting *People v. McCoy* (2013) 215 Cal.App.4th 1510, 1541; § 289, subd. (k)(1).) Accordingly, *People v. Ortega* (2015) 240 Cal.App.4th 956, 970,

---

[4] Count 15 charged attempted oral copulation. While this is a specific intent offense in that "all attempts require specific intent to commit the crime" (*In re Alberto S., supra,* 226 Cal.App.3d at p. 1464), it does not require the specific intent to act for the purpose of sexual arousal, sexual gratification or sexual abuse necessary to prove sexual battery.

held that sexual battery can be a lesser included offense of forcible sexual penetration.[5]

Forcible sexual penetration was charged in count 13 based on L.D.'s testimony that she saw Guevara holding six-year-old D.G.'s feet up with one hand while his other hand was under D.G.'s anus, touching it, with the middle finger straight out and the other fingers curled upwards, and that D.G. said Guevara was "putting his finger on her butt." Guevara offers no argument specific to this count as to how the evidence could have supported a finding that he committed sexual battery but not forcible sexual penetration. His argument in general, as we have said, is that he did not threaten or use force against L.D., Y.D. and D.G. to accomplish the sexual acts. The jury indicated its rejection of Guevara's claim that he did not threaten or use force against L.D., Y.D. and D.G. in the context of other counts, finding him guilty of making criminal threats against L.D. and Y.D., and of falsely imprisoning L.D. by violence or menace. Guevara does not suggest how force could have been an issue in count 13, given L.D.'s testimony that Guevara was holding the six year old's legs up with one hand with his other hand under her anus.[6] "[I]f there is no proof, other than an unexplainable rejection of the

---

[5] *People v. Ortega* applied the "expanded accusatory pleading" test to conclude sexual battery was a lesser included offense where the preliminary hearing testimony showed the sexual penetration charge was based on penetration by the defendant's fingers. (*Id.*, 240 Cal.App.4th at pp. 967, 970.) Sexual battery is not a lesser included offense of forcible sexual penetration under the statutory elements test because, since "the forcible sexual penetration statute encompasses different types of contact than the sexual battery statute, it is possible to commit the greater without committing the lesser (e.g., where penetration is accomplished by means other than a part of the perpetrator's body.)" (*Id.* at p. 967.)

[6] The jury was instructed, as to this count, that "[a]n act is accomplished by force if a person uses enough physical force to overcome the other person's will."

prosecution's evidence, that the offense was less than that charged, [lesser offense] instructions shall not be given." (*People v. Kraft* (2000) 23 Cal.4th 978, 1063.) The trial court did instruct the jury on assault or battery as lesser included offenses on this count, thus offering the jury an option if it was not convinced Guevara acted with the requisite sexual intent in the incident underlying count 13. Guevara has not demonstrated that the evidence supported instructions on sexual battery.

## III.

### *Substantial Evidence Supported the Convictions for Making Criminal Threats.*

### A. General Principles

Guevara next argues the evidence did not support the criminal threat convictions on counts 2,[7] 5 and 11. To establish the offense of making a criminal threat under section 422, "[t]he prosecution must prove '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat—which may be "made verbally, in writing, or by means of an electronic communication device"—was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the

---

[7] Guevara erroneously refers to count 3 rather than count 2 in his opening brief.

threatened person's fear was "reasonabl[e]" under the circumstances.' " (*In re George T.* (2004) 33 Cal.4th 620, 630, quoting *People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)[8]

We review Guevara's claim under the substantial evidence standard, pursuant to which " ' "an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt." ' [Citations.] ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' [Citations.]" (*George T., supra,* 33 Cal.4th at pp. 630-631.)

### B. There Was Sufficient Proof that L.D. Experienced Sustained Fear.

Guevara argues the evidence was insufficient to support his conviction of count 2, criminal threat to L.D., because the prosecution failed to prove the threat caused L.D. to be in sustained fear. "Sustained fear must occur over 'a period of time that extends beyond what is momentary, fleeting, or

---

[8] Section 422, subdivision (a), provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

transitory' " and "must be objectively and subjectively reasonable." (*People v. Roles* (2020) 44 Cal.App.5th 935, 942 (*Roles*).)

L.D. testified that she told Guevara many times that she wanted to leave him and, when she did, he told her "[i]f you leave me I kill you." The prosecutor asked how it made her feel when Guevara said this, and L.D. responded, "I felt very [impatient]"; the prosecutor asked if she was scared and L.D. said "[f]rom him, yes"; then the prosecutor asked whether she believed Guevara, and L.D. said, "[y]eah."

Emphasizing L.D.'s initial response that his threat made her feel "very [impatient]," Guevara asserts that "[*m*]*ere* fear did not sufficiently prove *sustained* fear." But L.D.'s initial response was immediately followed by her testimony that she was scared and believed Guevara. While this testimony does not directly establish the duration of L.D.'s fear, "all of the circumstances can and should be considered in determining whether a terrorist threat has been made." (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1014.) "The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) Here, the circumstances include that Guevara raped L.D. on multiple occasions over a number of years; that he locked L.D. and the girls in the house, having installed a lock on the front door that could not be opened from inside, a padlock on the back door and nails to prevent the windows from opening; that he kept a gun in the house; that the threat L.D. described was made repeatedly, in response to the "many" times L.D. said she wanted to leave him; and that despite his treatment of L.D. and her expressed desire to leave him, she did not do so. In sum, the evidence supports a conclusion that L.D.'s fear was considerably

24

more than " 'momentary, fleeting, or transitory.' " (*Roles, supra,* 44 Cal.App.5th at p. 942.)

The cases Guevara relies upon are not to the contrary. None actually involved a question as to whether the victim experienced "sustained fear." In *George T.,* the issue was whether a poem constituted a criminal threat (*George T., supra,* 33 Cal.4th at pp. 634-639); in *People v. Felix* (2001) 92 Cal.App.4th 905 (*Felix*), it was whether a threat made by the defendant was communicated to the victim (*id.* at p. 912); and *Roles* addressed whether multiple counts of criminal threats were supported where there was no evidence the victim experienced more than one period of sustained fear (*Roles, supra,* 44 Cal.App.5th at p. 942.)

Guevara's reliance upon the *Felix* court's statement that "the prosecution may not fill an evidentiary gap with speculation" is misplaced. There, the defendant made threatening statements about his ex-girlfriend to a therapist; the therapist called the ex-girlfriend; and, after the call, the ex-girlfriend cried and said the defendant was going to kill her. (*Felix, supra,* 92 Cal.App.4th at p. 909.) There was no evidence of what was said during the call, however, because the trial court sustained objections to questions about its contents. (*Ibid.*) *Felix* rejected the suggestion that it could be inferred the therapist must have told the ex-girlfriend what the defendant said because "there must be evidence to support an inference and the prosecution may not fill an evidentiary gap with speculation." (*Id.* at p. 912.) With no evidence of what was said during the call, the proposed inference was entirely speculative: The therapist could have warned the ex-girlfriend that the defendant was dangerous without relating his statements to her, and there was evidence of a previous direct threat to the victim that could have been the basis for her statement that he was going to kill her. (*Ibid.*)

25

The present case is quite different.  Given the evidence of ongoing abuse and repeated threats that L.D. testified she believed and made her scared, an inference that the threats caused L.D. to experience sustained fear was reasonable and evidence-based, not speculative.

### C.  There Was Sufficient Proof of Criminal Threats to Y.D.

Counts 5 and 11 charged criminal threats against Y.D.  Guevara argues the evidence was insufficient to support these counts because they were based on his pointing a gun at Y.D. and nonverbal conduct cannot be the basis of a conviction under section 422.

"Under Penal Code section 422, it is a crime to threaten infliction of great bodily injury or death on another 'with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat . . . .' " (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1140, quoting § 422, subd. (a).)  *Gonzalez* held that "a threat made through nonverbal conduct falls outside the scope of section 422 as currently written." (*Id.* at p. 1147.)  In that case, from a vehicle outside the restaurant where an off-duty police officer was eating with companions at a window booth, the defendant made a gang hand sign and manually simulated a pistol pointed upward. (*Id.* at p. 1140.)  Because no words or sounds accompanied the hand gestures, *Gonzalez* concluded the conduct did not constitute a threat within the meaning of section 422. (*Gonzalez,* at p. 1142.)

*Gonzalez* examined the legislative history of section 422, which showed that prior to a 1998 amendment, section 422 had referred to a "statement" intended to be taken as a threat.  Section 422 did not define "statement," but the Evidence Code defined "statement" as including " 'nonverbal conduct of a person intended by him as a substitute for oral or written verbal

expression.' " (*Gonzalez, supra,* 2 Cal.5th at p. 1143; Evid. Code, § 225.) The 1998 amendment to section 422 added the current language "requiring a relevant statement to be 'made verbally, in writing, or by means of an electronic communication device . . . .' " (*Gonzalez,* at p. 1143.)[9] *Gonzalez* explained, "After the amendment, Penal Code section 422's express reference to a statement 'made verbally' seems to exclude nonverbal conduct, at least when such a statement is not in writing or made via an electronic communication device." (*Id.* at p. 1144.) The Supreme Court declined to read " 'verbally' to include 'nonverbally,'" emphasizing that the Legislature "fully understands how to define the reach of a statute more broadly in keeping with its intent" but had not done so in section 422. (*Ibid.*)[10]

Here, Y.D. testified that Guevara had a gun in his hand every time he raped her, and that he would point the gun at her and "say that—to have relations with him." Unlike the situation in *Gonzalez,* this testimony did not describe *purely* nonverbal conduct: It described a nonverbal threat accompanied by a verbal command. While nonverbal conduct alone is insufficient to constitute a criminal threat, a combination of words and gestures may be sufficient. (*People v. Culbert* (2013) 218 Cal.App.4th 184,

---

[9] As the Supreme Court explained, the amendment was "primarily focused on expanding the reach of Penal Code section 422 to include electronic communications." (*Gonzalez, supra,* 2 Cal.5th at p. 1144.)

[10] As *Gonzalez* further explained, the Legislature demonstrated its ability to distinguish between verbal and nonverbal communication in a different statute proscribing threats to use a weapon of mass destruction. That statute, as originally enacted, referred to a "statement, made verbally, in writing, or by means of an electronic device" but was later amended to *include* nonverbal conduct by expressly incorporating the Evidence Code section 225 definition of "statement" that includes nonverbal conduct. (*Gonzalez, supra,* 2 Cal.5th at pp. 1144-1145.)

190; *People v. Franz* (2001) 88 Cal.App.4th 1426, 1442-1446.) " '[T]hreats are judged in their context.' [Citation.] '[I]t is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422.' [Citation.]" (*Culbert,* at p. 190.)

The defendant in *Culbert* argued his words—" '[d]on't lie to me' " and " '[d]on't call me that' "—did not implicitly or explicitly threaten to inflict great bodily injury or death and therefore did not constitute criminal threats. (*Id., supra,* 218 Cal.App.4th at p. 190.) But the words were uttered while the defendant was holding a gun to his stepson's head. *Culbert* explained, "Few objects are as inherently threatening as a firearm, especially when it is pressed to one's head. The only rational inference, considering the entire context in which these statements were made, is that appellant was threatening to harm [his stepson] if [the stepson] ever again lied or called him names. Appellant did not need to add a phrase like 'or else,' or 'I'm going to kill you,' to make his statements threatening. The firearm pressed against [the stepson's] temple accomplished that result." (*Ibid.*)

Similarly, here, Guevara's command to Y.D. to "have relations with him," made at gunpoint, communicated to her the threat that Guevara would shoot Y.D. if she did not submit—i.e., that he would "commit a crime which will result in death or great bodily injury" (§ 422). Substantial evidence supports the convictions.

### IV.

### *Guevara Was Properly Convicted of Felony False Imprisonment.*

Guevara was charged in count 3 with felony false imprisonment: violating L.D.'s personal liberty "by violence, menace, fraud, and deceit" in violation of section 236. " 'False imprisonment is the unlawful violation of

the personal liberty of another.' (Pen. Code, § 236.) False imprisonment is a misdemeanor unless it is 'effected by violence, menace, fraud, or deceit,' in which case it is a felony. (Pen. Code, § 237.)" (*People v. Wardell* (2008) 162 Cal.App.4th 1484, 1490.) Guevara concedes he committed misdemeanor false imprisonment but argues the evidence does not support the finding of violence, menace, fraud or deceit required for a felony conviction. In a related argument, he contends the jury instructions for this count were erroneous.

## A.     Substantial Evidence Supported the Conviction.

The jury was instructed that in order to find Guevara guilty on the charge of "false imprisonment by violence or menace" in count 3, the prosecution was required to prove he "intentionally confined someone, or caused that person to be confined by violence or menace" and "made the other person stay or go somewhere against that [person's] will." The instructions stated that "[v]iolence means using physical force that is greater than the force reasonably necessary to restrain someone" and "[m]enace means a verbal or physical threat of harm, including use of a deadly weapon. The threat of harm may be expressed or implied." The instructions further stated that "[f]alse imprisonment is a lesser crime to false imprisonment by violence and menace," requiring the prosecution to prove "the defendant intentionally confined a person" and "the defendant's act made that person stay or go somewhere against that [person's] will."

The evidence established that the lock on the front door of the family's home had been installed "backwards," so that it could not be opened from the inside without a key; a padlock on the back door prevented it from being opened, and nails in the window frames prevented opening the windows. L.D. did not have a key to the locks on the doors. Guevara twice locked L.D.

29

and the children in the house when he went to work. L.D. once asked why he would leave her locked in and Guevara "just laugh[ed]."

In arguing this evidence failed to establish he confined L.D. against her will by "violence, menace, fraud, and deceit," Guevara again overlooks the overall context within which his offenses were committed. Not only did Guevara confine L.D. in the house against her will, but he also repeatedly raped her and threatened to kill her if she left him. In these circumstances, the jury could reasonably infer that Guevara confined L.D. against her will by express or implied threat of harm. " ' "Menace" is defined as " ' "a threat of harm express or implied by word or act." ' " ' [Citation.]" (*People v. Wardell, supra,* 162 Cal.App.4th at p. 1490.) The evidence supports the conviction of false imprisonment by menace.

## B. The Jury Instructions Were Not Erroneous.

Guevara also argues the instructions on false imprisonment were erroneous because they referred only to violence and menace, not fraud and deceit, while the information alleged that Guevara violated L.D.'s personal liberty "by violence, menace, fraud, and deceit" and the verdict for count 3 stated that Guevara was guilty of violating L.D.'s personal liberty "by violence, menace, fraud and deceit." Relying upon the trial court's "sua sponte duty to provide proper instructions on all of the elements of the charged offenses" (*People v. Lewelling* (2017) 16 Cal.App.5th 276, 295), Guevara argues his felony conviction must be reduced to a misdemeanor because the jury found him guilty of false imprisonment by means of "fraud and deceit" without having received any instruction on "the fraud and deceit elements." By failing to instruct on fraud and deceit, Guevara maintains, the trial court made "[e]lemental instructional errors."

30

Felony false imprisonment does not require proof of *all* the elements stated in section 237 ("violence, menace, fraud, or deceit"); the offense is elevated from misdemeanor to felony by the "presence of one or more of these elements." (*People v. Haney* (1977) 75 Cal.App.3d 308, 313.) *Haney* found prejudicial instructional error where the trial court failed to instruct the jury on any of the elements necessary to establish felony false imprisonment. (*Id.*, 75 Cal.App.3d at pp. 310-313.) Here, the trial court instructed the jury pursuant to CALCRIM No. 1240 on false imprisonment by violence or menace,[11] allowing the jury to find Guevara guilty of the felony offense if it found the prosecution proved he confined L.D. by either of these means. There was no evidence of false imprisonment by fraud or deceit and therefore no need for an instruction on these alternative means of commission. Guevara offers no explanation how instructions on fraud and deceit would have been supported, much less required, or how he could have been prejudiced by the absence of such instructions.

The fact that the verdict form tracked the language of the information, which in turn tracked the statutory language, does not mean the jury found Guevara confined L.D. by fraud and deceit. To do so, the jury would have had to ignore the court's instructions, which required proof of violence or menace, and conclude Guevara confined L.D. by means of fraud or deceit despite the lack of any evidence he effected the confinement by such means. We presume the jurors followed the court's instructions. (*People v. Frederickson* (2020) 8 Cal.5th 963, 1026.) Indeed, it strains credulity to imagine jurors would

---

[11] The commentary to CALCRIM No. 1240 states, "The committee found only one case that involved fraud and deceit. [Citations.] Thus, this instruction focuses on the use of violence or menace to restrain the victim. If there is evidence of the use of fraud or deceit, the court must modify the instruction."

have disregarded the court's instructions, which were consistent with the evidence, in order to find Guevara acted in a manner not shown by any evidence.[12]

V.

### *The Section 667.61, Subdivision (e)(6), Finding on Counts 4 and 12 Are Unsupported by the Evidence.*

Guevara challenges the jury's findings that he administered a controlled substance to Y.D. in the commission of the offenses charged in counts 4, 8, 9 and 12. (§ 667.61, subd. (e)(6).)[13] He argues that Y.D.'s testimony about Guevara giving her drugs was limited to " 'the first time' in her bedroom" and did not extend to count 4, which was based on an incident in the living room, counts 8 and 9, which Guevara describes as pertaining to "ejaculation on the carpet," or count 12, which the prosecutor told the jury

---

[12] Defense counsel did not object to the instructions given or request any modification.

[13] Section 667.61 is an " 'alternative sentencing scheme' " that " 'mandates an indeterminate sentence of 15 or 25 years to life in prison when the jury has convicted the defendant of a specified felony sex crime (§ 667.61 [listing applicable crimes]) and has also found certain factual allegations to be true (§ 667.61, subds. (d), (e)).' " (*People v. Carbajal* (2013) 56 Cal.4th 521, 534, quoting *People v. Anderson* (2009) 47 Cal.4th 92, 102.) A sentence of 25 years to life is required when the defendant is convicted of a specified offense "under two or more of the circumstances specified in subdivision (e)." (§ 667.61, subd. (a).) Section 667.61, subdivision (e)(6), applies when the defendant "administered a controlled substance to the victim in the commission of the present offense in violation of Section 12022.75." Subdivision (e)(4) of the statute applies when the defendant "has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim."

Here, the true findings on the drug administration allegations, together with true findings under another subdivision of section 667.61, resulted in sentences of 25 years to life on these counts. (§ 667.61, subds. (a), (e)(4), (e)(6).)

was an incident in Guevara's bedroom.  We agree with Guevara as to count 12, but not as to the other counts.

## A. **The Allegations in Connection with Counts 8 and 9 Are Supported by the Evidence.**

Y.D. testified that Guevara "would give [drugs] to me so I would have sex with him" and that she took the drugs because "he would threaten me." She identified the drugs Guevara would give her as cocaine and methamphetamine, both of which are controlled substances as defined in section 667.61, subdivision (e)(6). (§§ 667.61, subd. (e)(6), 12022.75; Health & Saf. Code, §§ 11054, subd. (f)(1) [cocaine], 11055, subds. (b)(6) [cocaine], (d)(2) [methamphetamine].)  She also specifically described an occasion on which she had taken the drugs and Guevara raped and sodomized her in her bedroom and ejaculated in her vagina.  The prosecutor identified this incident as the basis of counts 8 and 9.

Y.D.'s testimony clearly supported the section 667.61 findings in connection with counts 8 and 9.  First, contrary to Guevara's suggestion, her testimony about Guevara giving her drugs was not limited to a single incident:  She testified that he "would" give her drugs which she took because he "would" threaten her.  Second, Guevara's assertion that counts 8 and 9 "pertained to ejaculation on the carpet" is inaccurate.  The prosecutor did discuss Guevara's ejaculation on the carpet in her argument concerning count 8, suggesting the physical finding of semen on the carpet should lead jurors to conclude Y.D.'s testimony was true.  But these counts, charging forcible rape and forcible sodomy, were necessarily based on Guevara putting his penis in Y.D.'s vagina and anus.  As the prosecutor told the jury, count 8 was "in the bedroom.  She recalls the defendant coming in her bedroom, and actually having sex with her.  Putting his penis in her vagina . . . ."  Count 9 was based on Guevara "also putting his penis inside her anus that time in the

33

bedroom." The prosecutor's argument that Y.D. "recalls this time that he ejaculated, and he would ejaculate on the carpet as well as the bed" was consistent with Y.D.'s testimony that Guevara ejaculated in her vagina on the occasion in her bedroom being discussed, and that he also ejaculated on her carpet. As we have said, Y.D. testified that on this occasion she had taken the drugs Guevara gave her.

**B. The Section 667.61, Subdivision (e)(6, Findings on Counts 4 and 12 Are Not Supported by the Evidence.**

Count 4 was described in the information and on the verdict form as an act of forcible sodomy, "to wit, the first time." Y.D. testified that Guevara touched her vagina and her anus with his penis "[m]ore than 30 times," and she specifically described two incidents in which he put his penis in both her vagina and her anus, one that occurred in the living room and the other in Y.D.'s bedroom. The prosecutor told the jury that count 4 was based on the living room incident.

Y.D.'s testimony was inconsistent as to whether the "first time" was in the living room or in her bedroom. Asked about "the first time that something had happened in Avenal," Y.D. responded, "[t]he time he got some drugs, he would give them to me so I would have sex with him." The prosecutor asked what room she was in "this first time" and Y.D. said, "my room." As her testimony continued, however, Y.D. indicated that the "first time" was in the living room. The prosecutor asked if Y.D. remembered a time when Guevara had her watch something on TV and she said "[y]es," then said "yes" when the prosecutor asked if this was "the first time something had happened." After eliciting Y.D.'s testimony about Guevara playing pornography and forcibly putting his penis in her vagina and her anus, the prosecutor referred to the incident with pornography on the TV as having been in the living room, and Y.D. did not suggest this was incorrect.

34

The prosecutor then asked about Y.D. having mentioned "the time that something happened in your bedroom." Y.D. said she did not recall and the prosecutor reminded her, "You talked about how he would give you drugs and he came into your bedroom?" Y.D. responded, "Yes," and when asked if she knew what type of drugs he "would give you," she said cocaine and "crystal." The prosecutor asked, "So this time where he came into your bedroom had you taken drugs?" She said "[y]es" and went on to describe the evidence relating to counts 8 and 9.

In closing argument, the prosecutor told the jury that "the first time she was assaulted by the defendant was in the living room" when "[h]e turned on pornography," and that this incident was the basis of the forcible sodomy charged in count 4. But nothing in Y.D.'s testimony linked Guevara giving Y.D. drugs to the incident in the living room. As we have said, her testimony supports a reasonable inference that Guevara gave her drugs on multiple occasions and not, as Guevara suggests, just "the first time." Still, all the testimony about drugs was tied to incidents in Y.D.'s bedroom, not the living room, and Y.D. never testified that Guevara gave her drugs *every* time he molested her. The jury was entitled to conclude the "first time" was in the living room, thus supporting the conviction on count 4, but there was no basis in the evidence for a conclusion that Guevara gave Y.D. drugs on that occasion.

Count 12 alleged that Guevara forcibly raped Y.D. on or about June 6, 2017. This was the day of Guevara's arrest. Y.D. testified that on the day of his arrest, while she was showering in the bathroom of her mother's bedroom, Guevara got into the shower with her, forcibly put his penis in her vagina, started putting his penis in her anus, touched her breasts and touched her vagina with his hands and mouth. Y.D.'s testimony about the incident did

not include any reference to drugs. The People argue the drug administration allegation was supported by Y.D.'s testimony that Guevara "would make her 'take those drugs' and then force her to have sexual relations with him." Y.D. never testified, however, that Guevara gave her drugs *every* time he molested her, and the jury *rejected* the drug administration allegation in connection with count 7, which charged Guevara with forcible oral copulation on June 6, 2017. As the rape Y.D. described having occurred on June 6, 2017, was part of the same shower incident, we find no basis in the evidence for a reasonable inference that Guevara administered drugs to Y.D. in connection with this offense. The section 667.61, subdivision (e)(6), finding on count 12 must be stricken.

**VI.**

### *Section 654 Does Not Require Staying the Sentences*
### *on Counts 5 and 11.*

Guevara was convicted on counts 5 and 11 of making criminal threats against Y.D. and sentenced to a consecutive eight-month term on each. Section 654, subdivision (a), provides that "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." Guevara argues that counts 5 and 11, based on Y.D.'s testimony that he threatened her with a gun to force her to have sex with him, cannot be separated from the forcible sex acts of which he was also convicted and therefore cannot be separately punished.

#### A. General Principles

Section 654's "reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) " 'Whether a course of criminal conduct is divisible and therefore gives

36

rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 336, quoting *Neal v. State of California* (1960) 55 Cal.2d 11, 19.) "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335, quoting *People v. Beamon* (1973) 8 Cal.3d 625, 639.) " 'The point of determining whether a defendant had more than one criminal objective is to discover whether the defendant's multiple actions should be considered one criminal act or more than one criminal act for the purpose of section 654.' " (*Roles, supra*, 44 Cal.App.5th 935, 946, quoting *People v. Louie* (2012) 203 Cal.App.4th 388, 397.)

Additionally, " ' [w]here a course of conduct is divisible in time it may give rise to multiple punishment even if the acts are directive to one objective.' (*People v. Louie, supra*, 203 Cal.App.4th at p. 399.) 'This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one . . . .' (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) Thus, '[i]f the separation in time afforded [a] defendant[] an opportunity to reflect and to renew [his or her] intent before committing the next crime, a new and separate crime is committed.' (*Louie*, at p. 399.) [¶] Moreover, ' "[i]f a course of criminal conduct causes the commission of more than one offense, each of which can be committed without committing

any other, the applicability of section 654 will depend upon whether a separate and distinct act can be established as the basis of each conviction." ' (*People v. Beamon*[, *supra,*] 8 Cal.3d [at p.] 637.)" (*Roles, supra,* 44 Cal.App.5th at p. 946.)

"When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective." (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.)[14]

### B. The Criminal Threats Were Punishable Separately from the Forcible Sex Offenses.

In Guevara's view, his act of threatening Y.D. with a gun was the means by which he forced her to have sex with him and therefore cannot be punished separately from the resulting forcible sexual act. We disagree. Guevara's criminal threats were completed offenses at the moment he demanded sex at gunpoint and thereby caused Y.D. to be in sustained fear, regardless of whether the threats resulted in Y.D. submitting to his sexual demands. The intent necessary for a criminal threat conviction is intent "for the victim to receive and understand the threat." (*People v. Wilson* (2010) 186 Cal.App.4th 789, 806.) Even assuming Guevara's overall objective in making the criminal threats was to force Y.D. to comply with his sexual demands, he nevertheless completed two "separate and distinct" acts each time he committed a forcible sex offense after threatening Y.D. with a gun:

---

[14] Section 654 issues are reviewable on appeal even if not raised in the trial court because section 654 error results in an " ' "unauthorized" sentence.' " (*People v. Brents, supra,* 53 Cal.4th at p. 618.)

38

The criminal threat and the completed forcible sex act. Moreover, the threats were not the sole means by which Guevara committed the sexual offenses: Y.D. testified not only that Guevara threatened her with a gun in to make her have sex with him but also that he committed the sexual acts *by means of force*: In the living room incident, Guevara "grabbed me by force, pulled down his pants, and put his penis in my vagina"; in her bedroom, he "grabbed me by force, and he would make me have sex with him," putting his penis in her vagina and her anus; in the shower, he "grabbed me by my hands, and he started to put his penis in my vagina by force." Thus, just as each criminal threat was complete regardless of whether the sexual act it was meant to facilitate was accomplished, the forcible sexual offenses were complete regardless of the threat.

*People v. Roles,* upon which Guevara relies, presented a significantly different situation. The defendant in *Roles* was convicted of stalking based on 28 voice messages he left for the victim over several days; 15 of these were threatening messages for which the defendant was convicted of making criminal threats. (*Roles, supra,* 44 Cal.App.5th at p. 945.) *Roles* held the defendant could not be punished for both making criminal threats and stalking because both convictions were based on the same series of threatening voice messages made with the single objective of placing the victim "in fear of losing her life or children because defendant wanted her to experience what he was feeling." (*Id.* at pp. 947-948.) Unlike the present case, both convictions were based on the same criminal act of threatening the victim. Here, as we have said, Guevara's act of threatening Y.D. with a gun and demanding sex was separate and distinct from his acts of forcible rape, forcible sodomy and forcible oral copulation.

Additionally, the trial court here could have determined that Guevara had an opportunity to " 'reflect and to renew' " his intent after making the criminal threat and before committing the sexual offense. (*Roles, supra,* 44 Cal.App.5th at p. 946, quoting *People v. Gaio, supra,* 81 Cal.App.4th at p. 935.) *Roles* noted that it was irrelevant whether the defendant had an opportunity to reflect between making each phone call because, since the victim heard all the messages at one time and experienced a single period of sustained fear, the series of calls constituted a single criminal threat. (*Id.* at pp. 942-943, 947.) The court observed, "If there was evidence in the record that [the victim] sustained fear from individual voice messages, such that some of the threatening voice messages could apply to the stalking conviction and others could support the criminal threats conviction, the People's position might have merit." (*Id.* at p. 948.) Here, each conviction of making a criminal threat is based on a separate act—the threat at gunpoint—from the acts establishing the forcible sex offenses. Further, Guevara was convicted of multiple forcible sexual offenses against Y.D.—two counts of forcible rape, two counts of forcible sodomy, one count of forcible oral copulation—and only two counts of making criminal threats. Necessarily, some of the forcible sex offenses were not part of the same course of conduct as the criminal threats of which Guevara was convicted.

## VII.

### *The Upper Term Sentence on Count 15 Is Invalid Under Senate Bill No. 567.*

Guevara was sentenced to a determinate prison term of eight years plus an indeterminate prison term of 210 years to life. The determinate term included an upper term sentence of four years on count 15 (attempted oral copulation of D.G.), along with consecutive one-third middle terms of eight months on counts 2, 3, 5, 6, 10 and 11.

At the time Guevara was sentenced, section 1170, subdivision (b), gave the trial courts broad discretion to decide which of the three terms specified for an offense would best serve the interests of justice. (See § 1170, subd. (b), as amended by Stats. 2020, ch. 29, § 14.) Subsequently, effective January 1, 2022, Senate Bill No. 567 (2021–2022 Reg. Sess.) amended section 1170, subdivision (b) in a number of respects, one of which was to make the middle term of imprisonment the presumptive sentence. (§ 1170, subd. (b)(2); Stats. 2021, ch. 731, § 1.3.) Under the amended statute, "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (§ 1170, subd. (b)(1).) "A trial court may impose an upper term sentence only where there are aggravating circumstances in the crime and the defendant has either stipulated to the facts underlying those circumstances or they have been found true beyond a reasonable doubt. (§ 1170, subd. (b)(1)–(2).)" (*People v. Flores* (2022) 75 Cal.App.5th 495, 500.) The sentencing court can also rely on certified records of conviction without having to submit the prior convictions to the jury. (*Ibid.*; § 1170, subd. (b)(3).)

The parties agree that the Senate Bill No. 567 (2021–2022 Reg. Sess.) amendments apply retroactively to this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308; *People v. Flores* (2021) 73 Cal.App.5th 1032, 1039.) We concur.

The parties further agree that remand is required, and again we concur. The trial court did not explain its reasons for imposing the aggravated term on count 15 except to say generally that it was adopting the sentencing recommendations of the probation department. The probation

report identified six aggravating circumstances and one mitigating circumstance,[15] and recommended imposition of the upper term on count 15 without further explanation. None of the aggravating circumstances listed in the probation report were found true beyond a reasonable doubt by the trier of fact or stipulated to by Guevara. Respondent acknowledges that the record is insufficient to permit "a good-faith harmless error argument." Accordingly, the upper term sentence on count 15 must be stricken and the matter remanded for resentencing.

On remand, the People may elect to proceed under the amended section 1170, subdivision (b) by proving the existence of aggravating factors beyond a reasonable doubt to a jury (or to the court, if Guevara waives his right to a jury trial), or the People may accept resentencing on the record as it stands. (*People v. Lopez* (2022) 78 Cal.App.5th 459, 468.) Pursuant to the full resentencing rule, on remand the trial court may revisit all its sentencing choices in light of current legislation. (*People v. Valenzuela* (2019) 7 Cal.5th

---

[15] The aggravating circumstances cited in the probation report were that the crime "involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness" (Cal. Rules of Court, rule 4.421(a)(1)); the defendant "was armed with or used a weapon at the time of the commission of the crime" (*id.,* rule 4.421(a)(2)); the victims were "particularly vulnerable," as two were minor children and dependent on the defendant's care (*id.*, rule 4.421(a)(3)); the "manner in which the crime was carried out indicates planning, sophistication, or professionalism" (*id.*, rule 4.421(a)(8)); the defendant "took advantage of a position of trust or confidence" to commit the offenses (*id.*, rule 4.421(a)(11)); and the defendant "has engaged in violent conduct that indicates a serious danger to society." (*Id.*, rule 4.421(b)(1).) The identified factor in mitigation was that the defendant had no prior criminal record. (*Id.*, rule 4.423(b)(1).)

415, 424-425; *People v. Buycks* (2018) 5 Cal.5th 857, 893; *People v. Garcia* (2022) 76 Cal.App.5th 887, 902-903.)

## DISPOSITION

The convictions are affirmed.

The section 667.61, subdivision (e)(6), findings on counts 4 and 12 are stricken.

The sentence on count 15 is vacated.

The matter is remanded for resentencing in accordance with current applicable sentencing laws and the views expressed in this opinion.

_____

STEWART, P.J.

We concur.


_____

RICHMAN, J.


_____

MILLER, J.


*People v. Guevara* (A165852)

44